UNITED STATES of America, Plaintiff,

v.

Confesor FALU–GONZALEZ; Giovanny Hernandez–Garcia, Defendants.

No. 95–160(SEC).

United States District Court,
D. Puerto Rico.

March 6, 1998.

Miguel A. Pereira, Assistant U.S. Attorney, U.S. Atty's Office, Hato Rey, PR, for plaintiff.

David W. Román, Guaynabo, PR, Leonard F. Baer, Coral Gables, FL, Gustavo A. Del-Toro-Bermúdez, San Juan, PR, for defendants.

## OPINION AND ORDER

CASELLAS, District Judge.

Pending before the Court is defendant Confesor Falú–González's Motion for New Trial **(Docket # 1302)**, filed on April 29, 1997. Defendant Falú was joined in his motion for new trial by co-defendant Giovanny Hernández–García. In order to fully address the issues posed by defendants, the Court held an evidentiary hearing on June 24, 1997, which was continued on November 5, 1997 **(Dockets # 1370(T1), 1461(T2), Transcripts of Proceedings)**. To supplement the discussion at the hearings, defendant Confesor Falú–González ("Falú") filed a Brief in Support of Motion for New Trial on December 1, 1997 **(Docket # 1467)** and defendant Giovanny Hernández–García ("Hernández") filed his Memorandum in Support of Motion for New Trial on December 30, 1997 **(Docket # 1487)**. The Government filed its consolidated response to defendants' motions on January 26, 1998 **(Docket # 1494)**. Subsequently, on February 3, 1998, defendant Falú requested leave to reply to the Government's response, which was granted by the Court. This reply was deemed filed on February 8, 1998. **(Docket # 1503)**. For the reasons set forth below in this Opinion and Order, defendants Confesor Falú–González and Giovanny Hernández–García's motions for new trial are **DENIED.**

### Facts of the Case

The First Circuit Court of Appeals, in its recent opinion in *United States v. Alicea–Cardoza*, 132 F.3d 1 (1st Cir.1997), described the conspiracy in this case as follows: "A cocaine distribution conspiracy out of the Virgilio Davila Public Housing Project in Bayamon, Puerto Rico led to the indictment of thirty-six defendants. Twenty-five pled guilty either before trial or shortly after trial started. Eight defendants were tried to verdict, five were acquitted." The case decided by the First Circuit dealt with one of those three defendants who went to trial and were

convicted by the jury. Defendant Alicea–Cardoza's conviction was upheld by the First Circuit, which found that there was sufficient evidence introduced at trial to uphold his conviction. The First Circuit found that contrary to what Alicea–Cardoza claimed, "the evidence clearly suggests that Alicea–Cardoza was closely involved with Solano–Moreta in the drug trade, and is plainly sufficient to sustain the conviction." *Id.* at 5.

The motions for new trial presently pending before the Court pertain to the two remaining defendants who went to trial and were convicted: Confesor Falú–González and Giovanny Hernández–García. Defendants were specifically charged with conspiracy to distribute at least fifty grams of cocaine base, five kilograms of cocaine, and one kilogram of heroin, all in violation of 21 U.S.C. §§ 841(a)(1) and 846.

The evidence against defendants consisted of transcripts of Title III intercepts, video recordings, and witness testimony. In addition to the calls that he is questioning through his motion for new trial [1], Confesor Falú was linked to the conspiracy via other telephone calls, several beeper messages, two videotapes, as well as through the testimony of co-conspirators Angel Ruiz–Adomo and Javier Pérez–Alicea. (For relevant excerpts of Pérez–Alicea's testimony, see Attachment F, Government's Opposition to Motions for New Trial, **Docket # 1494**). Defendant Falú also took the stand in his own defense, trying to explain the evidence against him in a way that portrayed him as someone outside of the Solano–Moreta organization, whose communications with Solano–Moreta were solely in an attempt to get Solano–Moreta to finance a rap music video for Falú. (See Transcript of Confesor Falú's testimony at trial, August 5, 1996, **Docket # 1411**). The jury apparently did not find his explanations credible and found him guilty as charged in the conspiracy.

There was an even greater amount of evidence presented against defendant Hernández, who is only questioning the validity of one telephone call. Not only was he identified by one of the witnesses as part of the conspiracy, but there was evidence submitted at trial that he had sent several hundred beeper messages to Solano–Moreta during the intercept period of late April 1995 and early June 1995. (See Attachment E, Government's Response to Motions for New Trial, **Docket # 1494**). In addition, there are at least three intercepted calls whose validity is not being called into question by the defense where Hernández is identified. Finally, defendant Hernández was videotaped at one of the drug points run by the conspiracy with a drug deck ("el muerto") in his hand.

Defendants Falú and Hernández allege that they discovered, after the trial, that evidence used to convict them may have been tainted, specifically that tapes and transcripts of telephonic conversations that were recorded by Government agents as a result of judicially-authorized wire intercepts may have been recorded outside of the wiretap authorization period. Except for one phone call for which defendant Falú brought in two witnesses to bolster his claim that the call occurred outside of the wiretap authorization period, defendants rely solely on the fact that four phone calls which appear in the pen register and Government logs do not appear on the toll records for the intercepted cellular phone. They also say that in a memorandum prepared by the Government to the court the U.S. Attorney indicated that there had been no activity on the target phone after April 24, 1995, in spite of the fact that the Government claims that one of the calls occurred on April 25, 1995. They further argue that such evidence is material and constitutes sufficient basis for granting a motion for new trial because but for its introduction, defendants would not have been convicted.

The Government contends that defendants are precluded from presenting these motions for new trial outside of the seven-day period prescribed by Fed.R.Crim.P. 33 because the evidence that defendants are presenting to bolster their claims of taint and excludability is not "newly discovered" within the purview of the rule. The Government adamantly denies any wrongdoing regarding wiretapping

---

**1.** Calls No. 104, 130, and 245; Exhibits 79, 86, and 112 at trial, respectively. Defendant Her- nández is contesting one telephone call, Exhibit 69 at trial.

outside of the judicially authorized period, specifically countering defendants' claims by stating that the pen register devices utilized in these investigations are only connected by the telephone company pursuant to a court order. They minimize any discrepancy between the phone company billing records on the one hand, and the pen register and the agents' logs on the other emphasizing that the pen register and the agents' logs are consistent with each other. In addition, the Government has attempted to discredit the evidence and witnesses presented by defendant Falú to support his claim that one particular telephone conversation in question occurred during the period of April 11–14, 1995, rather than on April 25, 1995 as the Government stated at trial. Finally, the Government contends that even if the discrepancy between the telephone records and the pen register and agents' logs is found to be newly discovered evidence within the purview of Rule 33, that there exists sufficient remaining evidence to uphold defendants' convictions so that a new trial is not warranted because an acquittal would not probably result therefrom.

**Motion for New Trial Standard**

■ A motion for new trial on the basis of newly discovered evidence will not be granted unless the moving party can demonstrate that

(1) the evidence was unknown or unavailable to the defendant at the time of trial; (2) failure to learn of the evidence was not due to a lack of diligence by the defendant; (3) the evidence is material, and not merely cumulative or impeaching; and (4) it will probably result in an acquittal upon retrial of the defendant.

*United States v. Formanczyk,* 949 F.2d 526, 531 (1st Cir.1991) (*quoting United States v. Martin,* 815 F.2d 818, 824 (1st Cir.1987)). As stated above, under Fed.R.Crim.P. 33, the burden is on the defendant to prove that each of these four elements is present. *United States v. Slade,* 980 F.2d 27, 29 (1st Cir.1992). This Court has stated that the requirements of Rule 33 are extremely stringent and hard to comply with. *United States v. Ortiz–Miranda,* 931 F.Supp. 85 (D.Puerto Rico, 1996). *See also United States v. Drap-*

*er,* 746 F.2d 662, 665 (10th Cir.1984), *citing United States v. Weninger,* 624 F.2d 163, 167 (10th Cir.1980), *cert. denied,* 449 U.S. 1012, 101 S.Ct. 568, 66 L.Ed.2d 470 (1980).

■ It is "important for the orderly administration of criminal justice that findings on conflicting evidence by trial courts on motions for a new trial based on newly discovered evidence remain undisturbed except for the most extraordinary circumstances..." *United States v. Johnson,* 327 U.S. 106, 111, 66 S.Ct. 464, 90 L.Ed. 562 (1946), and "only in exceptional cases in which the evidence preponderates heavily against the verdict." *United States v. Leon–Lopez,* 891 F.Supp. 138 (S.D.N.Y.1995), *quoting United States v. Rush,* 749 F.2d 1369, 1371 (9th Cir.1984). The First Circuit Court of Appeals has reiterated that holding, stating that "[w]hen considering such a petition, the district court has considerable latitude in weighing the evidence and assessing the credibility of witnesses who testified at trial and those whose testimony constitutes 'new evidence'." *United States v. Glantz,* 884 F.2d 1483, 1486 (1st Cir.1989). In addition, the First Circuit has held that it "will not overturn the district court's factual findings unless they are without any support in the record, and its decision to deny a new trial will be affirmed unless the court has 'manifestly abused' its discretion." *Id.*

■ Courts have defined "newly discovered evidence" as that which "could not have been discovered with due diligence at the time of trial." *United States v. Johnson,* 596 F.2d 147, 148 (5th Cir.1979), *citing United States v. Beasley,* 582 F.2d 337, 339 (5th Cir.1978). Courts have found that "newly discovered evidence" must be defined restrictively in order to "preserve[ ] the limited character of the exception to the seven-day time limit on new trial motions" *United States v. Ugalde,* 861 F.2d 802, 808 (5th Cir.1988). The First Circuit has found that "courts have given a narrow meaning to the phrase 'newly discovered,' holding that the defendant must demonstrate not only that the evidence was unknown or unavailable at the time of the trial, but also that 'failure to learn of the evidence was not due to lack of due diligence by the defendant.'"

*United States v. Lema,* 909 F.2d 561 (1st Cir.1990), *citations omitted.* "Due diligence requires that a defendant exert some effort to discover the evidence." *United States v. Jaramillo,* 42 F.3d 920, 925 (5th Cir.1995). In addition, the First Circuit has stated that a motion for new trial based on newly discovered evidence faces "difficulty" because of "the reasonably high barriers erected by case law" to deter such filings. *United States v. Sepulveda,* 15 F.3d 1216, 1220 (1st Cir.1993).

As stated above, the last two prongs of the test are whether the evidence is material, rather than merely cumulative or impeaching, and whether the newly discovered evidence would probably result in an acquittal upon retrial. In light of the above-cited caselaw, we shall evaluate defendants' claims that the divergence between the toll records on the one hand, and the pen register and the Government logs on the other, is both newly discovered evidence and sufficient to warrant a new trial.

**Analysis**

**Whether the evidence is "newly discovered" under Rule 33**

█ We must first deal with the jurisdictional question under Rule 33. If, as is the case here, the motion for new trial is filed after seven days from the verdict, the court may only consider it if it is based on "newly discovered evidence." Utilizing the definition of newly discovered evidence we stated above, we must determine whether the information in question was unavailable to defendants at the time of the trial, and if so, whether they could have discovered it exercising due diligence.

Under the applicable caselaw, we find that defendants cannot argue that this evidence is "newly discovered" because the toll records in question were discoverable by the defense well prior to trial. The Government introduced proof that all the material in its possession relating to the wire intercepts here at issue was available for defendants on or about July 6, 1996. (See Exhibit 3, Hearings on Motion for New Trial; See also **Docket # 1494**, page 4, fn. 6) Defendants do not argue that any new information became available to them after the trial that prompted them to search for these toll records; in fact, there is no new information nor any changed circumstances that would warrant their search for the toll records that did not exist for the entire year that defendants were in possession of the relevant information and were detained awaiting trial. Thus, defendants cannot claim that they exercised due diligence when they did not seek these records out in their pre-trial discovery. Furthermore, the memorandum prepared by the Government which stated that the target phone had been inactive since April 24, 1995 (Defendant's Exhibit 3, November 5, 1997 hearing on motion for new trial) had been handed over in discovery to defendants; thus, they cannot claim that it is "newly discovered."

Defendants' bare assertions that the information was not available prior to the time they filed their motions for new trial are insufficient for defendants to meet their due diligence burden. The instant case cannot be distinguished from *United States v. McDowell,* 830 F.Supp. 90 (D.Puerto Rico 1993), *aff'd,* 32 F.3d 561 (1st Cir.1994), *cert. denied,* 513 U.S. 1031, 115 S.Ct. 610, 130 L.Ed.2d 520 (1994), where the district court found that defendant's failure to seek out some allegedly exculpatory information contained in phone records not within the control of the Government constituted lack of due diligence. In that case, the court held that the defendant "has completely failed to indicate why he was unable to obtain the evidence prior to trial. He has not indicated that the existence of the phone bills was unknown or that they were unavailable to him at the time of trial, and/or that the failure to learn of this evidence was not due to his lack of diligence." *Id.* at 93.

Because defendants do not allege a single fact that leads this court to believe that their search for the phone records arose out of information that was not in the defendants' possession prior to trial, the Court finds that the defendants have not complied with the jurisdictional bar of Rule 33, that the evidence be "newly discovered." These toll records were discoverable by the defense at all times prior to trial, yet they made no attempt to subpoena them until defendants were con-

victed. As such, defendants cannot be said to have exercised the required due diligence under the rule, the evidence is not newly discovered, and the instant motions are time-barred under the seven-day filing period of Rule 33. However, we shall nevertheless address defendants' claims of Government misconduct on their merits, as alternative grounds of decision of defendants' motions for new trial.

**Credibility and Materiality of the Proffered Evidence**

■ The main thrust of defendants' motions for new trial is that there is a divergence between the information that is reflected in the toll records from the intercepted cellular phone and the information the Government introduced at trial, namely the Government logs and pen register records. As to defendant Falú, who has shouldered the burden of the argument for both defendants. he is claiming that three conversations that were introduced at trial did not occur within the wiretap authorization period because the billing records for the target cellular phone do not reflect that those calls occurred on the date alleged by the Government. Defendant Hernández is only arguing that one such telephone call is not reflected in the billing records of the target cellular phone. Beyond the incongruence between the billing records and the logs and pen register, defendant Falú introduced additional evidence to support his claim that the calls in question occurred outside of the wiretap authorization period. He attempted to place one of the three calls pertaining to him, call 245, as occurring in the period of April 11–14, 1995, rather than on April 25, 1995, as the Government claimed. Finally, defendants claim that the Government admitted that no phone call happened on April 25, 1995 because a Government memorandum stated that the target phone had been inactive since the day before.

The Government argues, and we have verified, that the pen register records and the Government logs are consistent with each other. In fact, Mr. John Faulds, the expert witness brought in by defendant Falú confirmed that on cross-examination by the Government. (See T1, **Docket # 1370**, pp. 65–72) In addition, most of the calls that are reflected in the pen register and the Government logs also have their corresponding entry in the toll records for the target phone, with only a minimal divergence between the times reflected in the pen register and in the toll records.

Furthermore, the April 20, 1995 call that is being questioned by defendant Falú, call no. 104, is one in which defendant Falú tells Solano–Moreta that he talked to "Baby" a/k/a Javier Pérez Alicea that day. (See Attachment A, Transcript of Exhibit 79, Call no. 104, **Docket # 1494**). The Government likewise introduced into evidence the transcript of a telephone call also recorded on April 20, 1995, between Pérez Alicea and Solano–Moreta in which Pérez Alicea tells Solano–Moreta that he had just talked to Confesor Falú who was offering him a car. (Attachment G, Transcript of Exhibit 70, **Docket # 1494**). It is an undisputed fact that Exhibit 70 does appear in the toll records for the target phone. It appears to confirm that call no. 104 occurred on the date proffered by the Government.

The pen register is a device which tracks and records the outgoing calls of a target phone and then prints a record of the number dialed, the start and stop times for each call, and the duration of each call. Congress has defined the pen register as "a device which records or decodes electronic or other impulses which identify the numbers dialed or otherwise transmitted on the telephone line to which it is attached." 18 U.S.C. § 3127(3). *See also* M. Wesley Clark, *Electronic Surveillance and Related Investigative Techniques,* 128 Mil.L.Rev. 155 (1990). A pen register gains access to the above-mentioned information through a line which is activated by the telephone company in charge of the target phone, in this case Celulares Telefónica. That information was confirmed by Mr. Héctor Rosa Hernández, an employee of the Puerto Rico Telephone Company who was subpoenaed by defendants. Upon direct examination by defendant Hernández's counsel, he explained the procedure for the installation and activation of the in-

tercept equipment pursuant to a Title III order:

> Q: Going to the Title III installation, isn't it true that the only action that the special services of the employees of Puerto Rico Telephone Company does is to hookup [sic] the telephone system to the agents?
>
> A: Once a technician receives the order he has to identify that which gives service from that office to that terminal, and it identifies the facility and then he goes on to install the equipment.

(T2 at pp. 32–33, **Docket # 1461**)

Accordingly, pen register access to the target phone appears to be impossible prior to the telephone company giving its consent and access, which is only granted pursuant to court authorization under 18 U.S.C. §§ 3122, 3123. The pen register prints a sequential record of all of these calls. In this instance there are corresponding calls in the toll record for the target phone both immediately before and after most of the calls which are missing from the toll record, and which are the crux of these motions for new trial. In addition, there are other calls which are not at issue in this motion which are reflected in the pen register, and for which there is no corresponding entry in the toll records. (Testimony of Mr. Faulds, T1, p. 69, **Docket # 1370**)

It appears to the Court that it would have been virtually impossible for the Government to be able to tamper with these records based upon the fact that the pen register could not have recorded the corresponding entries to the Government logs without the telephone company having granted access to the target phone pursuant to a court order. There are undoubtedly discrepancies between the toll records on the one hand, and the pen register and the Government logs on the other. However, defendants have failed to persuade the court that this discrepancy is due to some nefarious Government activity such as wiretapping and recording outside of the wiretap authorization period, rather than a temporary breakdown in the operations of the cellular phone company, or a mistake in the billing records, which from common experience are not infrequent. As to the memorandum prepared by the Government, it was accompanied by attached Government logs which did include telephone activity on that date. A minor inconsistency between them will not suffice to convince the Court that the calls did not occur as proffered by the Government.

Defendant Hernández presented no extrinsic evidence to prove that the one call which he is contesting did not actually occur on the date proffered by the Government. Instead, he has chosen to rely on defendant Falú's argument that the discrepancy between the toll records and the Government logs and the pen register is sufficient to prove Government misconduct, so as to exclude the calls in question. We have already ruled that such an argument, without any further proof that the calls did not in fact occur when the Government claims that they did, is insufficient to convince the court that Government misconduct occurred and that calls were taped and transcribed outside of the Title III authorization period. Defendant Falú also failed to present any further evidence regarding two of the three contested telephone conversations in his case, the ones which the Government claim occurred on April 20 and April 21, 1995, and which do not have a corresponding entry on the toll records for the target cellular phone. On the contrary, there is some evidence to suggest that the April 20, 1995 call took place as the Government has proffered. He therefore has also failed to persuade the court that those two calls did not occur as the Government records demonstrate.

However, he did present two witnesses to bolster his claim that one telephone call in particular, which the Government proffered took place on April 25, 1995, occurred instead sometime between April 11 and April 14, 1995. According to the Government, the telephone call in question, Call Number 245, Exhibit 112 at trial, allegedly took place on April 25, 1995. (See Attachment C, **Docket # 1494**, transcript of call) In that telephone call, which defendant Falú is not denying took place, Falú and Solano–Moreta discuss a music video in which Falú appeared for a rap artist known as Falo. Defendant Falú presented two witnesses, Rafael Esteban Cuevas Laguna, also known as

"Falo," and José Torres, an entertainment producer for Prime Entertainment, who claim that the video in which Falú said that he appeared that day in his conversation with Solano–Moreta was actually filmed between April 11 and April 14 of 1995. This, the defense contends, would mean that the conversation occurred around one of those days and was taped outside of the wiretap authorization period, which began on April 19, 1995.

"Falo" testified that defendant Falú appeared in a music video for one of his songs which was filmed in April of 1995. The defense brought a copy of the music video and "Falo" identified defendant Falú as appearing in the video. (T2, **Docket # 1461,** at p. 12) Upon being questioned by Mr. Baer, defendant Falú's counsel, "Falo" testified in the following way:

Q: That is Confesor Falú González, sir?

A: Yes.

Q: Approximately how many days did it take to shoot or photograph that video?

A: I don't remember exactly but it does take about three, four, five days.

Q: Again, that took place in April of 1995, am I correct?

A: Yes.

(T2, **Docket # 1461,** at pp. 12–13).

That was the basic substance of Falo's testimony. At no time did he testify that the video was filmed on April 11–14, as is claimed by the defense. In fact, it is clear from his testimony that he has a very vague recollection of the whole video filming process, in spite of the fact that it was his first video as a solo artist. The only witness presented by defendant Falú to bolster his claim that the video was not filmed on the date claimed by the Government in its records was entertainment producer José Torres, who testified in the following way to questions by Mr. Baer:

Q: Is that the video that your company, Prime Records produced as being the first video that Falo made as a solo artist?

A: Correct.

Q: Mr. Torres, do you have or to your knowledge do you know when the video was actually shot?

A: To the best of my knowledge, the video was shot or filmed in early April, between April 11 and the 14th.

Q: How do you know that, sir?

A: Before this one, a video of Cesar Flores had been recorded. We were in a hurry to make Falo's video because his record was already being sold on the streets and we needed a video.

Q: In the beginning of April of 1995 you shot another video with another artist, am I correct?

A: Exactly, in late March or early April.

Q: And the name of the artist is Cesar Flores?

A: Yes.

Q: So that I am clear on this again, you are indicating that you had to shoot this particular video very quickly after the Flores' video?

A: That is correct.

(T2, **Docket # 1461,** at p. 20)

Upon cross-examination by the Government, Mr. Torres testified as follows:

Q: "As I understood your testimony, Mr. Torres, please correct me if I am wrong, you just told the Court that your best memory was that it was from the 11th to the 14th but that it could be other days?

A: My best memory was it was from the 11th to the 14th.

Q: But from your memory?

A: Yes."

(T2, **Docket # 1461,** at p. 22)

The only documentary evidence presented by the defense to bolster their claim that the video in question was filmed on April 11–14, 1995, rather than on April 25, 1995, was an unsigned memorandum sent to Falo by Mr. Torres, addressed to "To Whom It May Concern," stating that the video had been filmed on those dates. (Defense Exh. 10, Nov. 5, 1997 hearing) Significantly, however, the defense presented no documentary evidence to back up the filming date, such as payroll records for the filming crew, or any business records kept by Prime Entertainment that would indicate that the video was filmed on April 11–14, 1995, and not on April 25, 1995. We find that this evidence is both vague and

unconvincing. The date this video was actually filmed should have been easily verifiable by the defense through the obtaining of business records. Instead, they solely introduced the testimony of a video producer who can only testify "to his best recollection" that the video was filmed between April 11–14th, 1995. In summary, we find that the testimony of these two witnesses is both vague and unreliable and insufficient to establish that the video in question was not filmed on April 25, 1995, but rather on April 11–14, 1995.

Finally, and more significantly, this belated attempt at placing call no. 245 outside of the wiretap authorization period conflicts directly with defendant Falú's own testimony at his trial, where he verified that the phone call occurred on April 25, 1995 upon a question by his counsel:

Q: This phone call was on April 25. After that phone call, did you ever speak to him on the phone again?

A: No.

(Transcript of Confesor Falú's testimony at trial, August 5, 1996, **Docket # 1411**, p. 37)

We find that the defense has not provided sufficient credible evidence to support their claims of Government misconduct. It is much more likely that the discrepancy between the toll records and the pen register and the Government logs is attributable to errors committed by the telephone company than to a sinister Government plot which is nearly impossible from a logistical standpoint. Furthermore, defendant Falú's own testimony confirms the fact that the call occurred on April 25, 1995, and not on some other date. If, as defendant Falú claimed, he was speaking to Solano–Moreta to get him to finance the music video which he was producing, then the alleged discrepancy between the date the video was supposedly filmed and the date the Government says the call took place should have been glaring to the defendant at that time. Instead, the accuracy of the date of the phone call was never questioned, in spite of the fact that he spoke in detail about the substance of the conversation. As such, we find that the introduction of the toll records for the target phone is not sufficiently material so as to warrant a new trial in this case.

## Whether the introduction of this evidence would probably result in an acquittal

As we have discussed above, we find that the evidence presented by defendants to bolster their claims of Government misconduct does not suffice to convince this Court that such misconduct occurred. In addition, we find that there is sufficient other evidence against defendants Falú and Hernández so that a new trial is not warranted. As we also discussed above, at trial the Government introduced two witnesses linking defendant Falú to the conspiracy, as well as numerous telephone conversations linking Falú to Solano–Moreta that are not the subject of this motion. Also, the Government introduced several beeper messages sent by Confesor Falú to Solano–Moreta. The First Circuit, in upholding the conviction of co-defendant Luis Alicea–Cardoza, recently held that beeper charts were valid evidence linking a defendant to a drug organization. *Alicea–Cardoza*, 132 F.3d at 4–5. In their review of the evidence presented against Alicea–Cardoza they noted that an agent of the Federal Bureau of Investigations had testified that, "in his considerable experience investigating drug gangs, these and other messages received by Solano–Moreta involved the drug trade." *Id.* at 4. At trial, defendant Falú admitted that he had sent the beeper messages to Solano–Moreta, but chose to explain them away to the jury, in a failed attempt to distance himself from the drug conspiracy. These were Confesor Falú's responses to questions from his then-counsel Pérez Olivo:

Q: I am showing you Exhibit 114 of the Government which was described as a record of beeper messages or calls. Did you, in fact, make those beeper message calls that appear there?

A: Yes.

Q: And what is the date of the first beeper message or call that appears there?

A: It says May 29, 1995.

Q: Is it fair to say that basically all you are saying there is urgent, urgent, urgent, call back, urgent?

A: Yes.

Q: And now, had you ever beeped him, I am talking about Wes Solano Moreta, before May 29, 1995?

A: Can you repeat the question?

Q: Had you ever beeped him before May 29, 1995?

A: Never.

Q: Now, could you please explain to the ladies and gentlemen of the jury, why is that you beeped him on these occasions?

A: When I sent these beeper messages to Wes Solano Moreta was when he found out that Delfin and I were fooling him. I ran into someone at the Copacabana that told me Wes Solano was pissed at me because I fooled him a lot, a lot of times I was fooling him.

Q: Anything else?

A: So I just started to beep him.

(Transcript of Confesor Falú's testimony, August 5, 1996, **Docket # 1411**, pp. 37–38)

The Government also introduced into evidence two videotapes in which defendant Falú was shown "partying" with Solano–Moreta, contradicting his version of the facts where he claimed that Solano–Moreta was just a passing acquaintance. (See Transcript of Confesor Falú's testimony, August 5, 1996, pp. 63–68, **Docket # 1411**) In addition, as demonstrated above, defendant Falú chose to testify at his trial, seeking to explain away the evidence, claiming that his link to Solano–Moreta arose because he was seeking financing for a music video, not because he was part of the drug conspiracy. The jury chose to believe the evidence proffered by the Government and consequently disbelieved defendant Falú's protestations of innocence. We shall not disturb the jury's findings based on the vague, unconvincing, and contradicted evidence presented by defendant.

■ As to defendant Hernández, the evidence against him was even more overwhelming. Even if we were to exclude all intercepted telephone calls, the evidence against him was vast, including witness testimony, a videotape showing him holding drugs in his hand, as well as hundreds of beeper messages sent by him to Solano–

Moreta during the intercept period. The possible suppression of one telephone call is clearly insignificant in light of the barrage of evidence which was presented against him.

In short, we find that even if defendants had complied with the first three prongs of the four-prong test, their motions for new trial should be denied because they have failed to comply with the fourth prong. We find that there was sufficient other evidence presented against them which is not contested in this motion that an acquittal would not be probable if they were retried.

### Whether a new trial should be granted under this Court's supervisory powers

■ Defendant Falú has requested, in the alternative, that this court grant his motion for new trial based on alleged prosecutorial misconduct as an exercise of our supervisory powers. As defendant Falú stated in his brief in support of motion for new trial (**Docket # 1467**), "[t]his supervisory power has been exercised by district courts to dismiss charges or grant a new trial in cases where the Government has engaged in misconduct and **bad faith** during discovery and trial." (**Docket # 1467**, at page 10, emphasis supplied, citing *United States v. Banks*, 383 F.Supp. 389 (D.S.D.1974), *appeal dismissed sub nom*, 513 F.2d 1329 (8th Cir.1975)). Because we do not find that there is any proof that the Government engaged in misconduct or conducted any proceedings in bad faith, we decline to exercise the supervisory powers attributed to us by defendant. There are no extraordinary circumstances present in this case that warrant upsetting the jury's verdict. On these alternative grounds, defendants' motions for new trial are also **DENIED.**

### Conclusion

Pursuant to the above discussion, defendants Confesor Falú–González and Giovanny Hernández–García's motions for new trial (**Dockets # 1302, 1467, 1487**) are **DENIED.** The Court finds that defendants have first failed to meet the jurisdictional requirement of Rule 33 that a motion for new trial filed after seven days must be based on evidence that is "newly discovered." Because defen-

dants did not exercise due diligence in discovering the evidence now being proffered, such evidence cannot be considered "newly discovered" as required by Rule 33; their motions for new trial are thus time-barred. Furthermore, even if we were to find that defendants' motions for new trial were timely filed, defendants have failed to meet each of the four required prongs in the test for granting a motion for new trial. We find that the information now being introduced by defendants was available at the time of trial, that such information could have been obtained through the exercise of due diligence prior to trial, that the evidence now being proffered is at best inconclusive and also cumulative, and that a retrial would not likely result in an acquittal of these defendants. In light of the above, we hereby determine that the best interests of justice would be frustrated were we to grant the instant motions. Finally, we decline to exercise any supervisory powers and grant a new trial because we find that defendants have failed to present evidence that would warrant upsetting the jury's verdict. Defendants motions for new trial are thus hereby **DENIED.**

 **SO ORDERED.**