David **LEMUS**, Petitioner,

v.

Christopher **ARTUZ**, Superintendent of Green Haven Correctional Facility, and Dennis Vacco, Attorney General of New York, Respondents.

Olmado Hidalgo, Petitioner,

v.

Christopher Artuz, Superintendent of Green Haven Correctional Facility, and Dennis Vacco, Attorney General of New York, Respondents.

Nos. 98 CIV. 7197(JSR), 98 CIV. 7200(JSR).

United States District Court, S.D. New York.

Feb. 15, 2001.

---

Nancy E. Little, Legal Aid Society, New York City, for David Lemus.

Eric Sears, New York City, for Olmado Hidalgo.

Sheryl Feldman, Asst. Dist. Atty., New York City, for Christopher Artuz and Dennis Vacco.

## MEMORANDUM ORDER

RAKOFF, District Judge.

On December 2, 1992, in New York State Supreme Court, a jury unanimously found beyond a reasonable doubt that David Lemus and Olmado Hidalgo had murdered Marcus Peterson, a security guard at a Manhattan nightclub, and had attempted to murder another security guard, Jeffrey Craig. On January 6, 1993, Lemus and Hidalgo were each sentenced to 25 years to life on the murder conviction and to a lesser concurrent sentence on the

attempted murder conviction. On June 3, 1997 the convictions were affirmed by the Appellate Division, First Department, and on October 14, 1997 leave to appeal these convictions further was denied.

Meanwhile, however, state and federal authorities had obtained new information suggesting the possibility that other persons had committed the murders. A motion for a new trial was made, but after holding an evidentiary hearing Justice Jay Gold, the experienced state jurist who had conducted the original trial, concluded that the new information was unreliable and, on October 29, 1996, denied the motion. Leave to appeal that order was denied by the Appellate Division on January 16, 1997.

Following these various state proceedings, petitioners filed the instant petitions for habeas corpus on October 13, 1998. The petitions were originally referred to Magistrate Judge Pitman, but because of unusual demands placed at that time on the Magistrate Judges in this District, the Court, by Order dated July 31, 2000, withdrew the referral and proceeded to hear argument on October 17, 2000. Upon full review of the entire record, the Court now concludes that the petitions must be denied.

The case ultimately traces back to a confrontation between a patron and several security guards at a Manhattan nightclub called the Palladium on November 23, 1990. The State's proof, as credited by the jury, showed that around 1:00 a.m. on that date Lemus, who had already entered the club, sought to leave temporarily to put something in his car, at which time he was told by one of the security guards that he could not re-enter unless he paid the cover charge again. A brief brawl ensued, after which Lemus walked to the parking lot and returned, heavily armed, with four other men, one of whom was Hidalgo. One of the guards struggled with Lemus in an effort to unarm him, at which point gunfire ensued. Two of the guards, Peter-son and Craig, were shot, and Peterson later died.

The State's proof at trial was substantial. Among other things, no fewer than four eye-witness security guards, including Craig, identified Lemus and Hidalgo as participants in the shootings. In addition, Dolores Spencer, a woman with whom Lemus was romantically involved at the time of the shootings, testified that Lemus left frantic messages on her answering machine shortly after the Palladium shootings and, when she returned his calls, told her that he had shot one of the guards and asked her to hide his gun in her house. After less than a full day's deliberation, the jury returned verdicts of guilty.

Shortly thereafter, on December 11, 1992, a cooperating informant, Bernardo Rodriguez, who claimed to have been present at the scene, told New York Police Detective Robert Addolorato that two other individuals, Joey Pillot and James Rodriguez (a/k/a "Spanky"), were the gunmen. Rodriguez's allegations were conveyed to the prosecutor on the case, Assistant District Attorney Stephen Saracco, in late January 1993, but Saracco regarded them as unworthy of belief because of material discrepancies with undisputed facts. For example, Rodriguez described the murdered guard, Peterson, as white when in fact Peterson was black. Consequently, Rodriguez's information was not made known to petitioners' counsel until December 1995.

Meanwhile, in 1994, a federal prosecutor, Assistant United States Attorney Steven Cohen, began meeting with Joey Pillot, who was facing unrelated murder charges and seeking to make a "deal" with federal prosecutors. Preliminary to making a proffer, Pillot entered into a standard agreement that guaranteed that anything he said during the proffer session could not be used against him. Pillot, as part of the proffer, then confessed to several serious crimes, but after several sessions was informed by Cohen that Cohen still thought Pillot was withholding infor-

mation. In response, Pillot then volunteered that he (Pillot) had been the actual, and sole, shooter in the Palladium incident. At a later session, however, Pillot changed his story and said that "Spanky" also had a gun and had attempted to fire it but that it had jammed. Finally, at a still later session, Pillot changed his story once again and told Cohen that it was Spanky, not Pillot, who had shot and killed Peterson. Eventually, all this information, as well as the earlier "tip" from Bernardo Rodriguez, was disclosed to petitioners' counsel.

Petitioners thereafter moved, in January 1996, to vacate their convictions on the basis of this newly-discovered evidence, while their then-pending direct appeal was held in abeyance. Following briefing, Justice Gold held a full evidentiary hearing that occupied various dates between April and June of 1996, and included, *inter alia*, testimony on petitioners' behalf from Pillot, his wife, and others. On October 29, 1996 Justice Gold issued a detailed written decision (reprinted in Lemus' Appendix at 5) that denied petitioners' motions in all respects.

Among other things, Justice Gold found the veracity of both Pillot and his wife "much worse ·than merely doubtful, their testimony [is] entirely unworthy of belief." Lemus App. at 11. As he noted, Pillot's statements were riddled with inconsistencies and improbabilities. As to motive, Justice Gold found that "Pillot, believing he had immunity from prosecution, falsely claimed responsibility for the Palladium murder to placate the· AUSA (his lifeline to favorable treatment by the authorities) . . . ." *Id.* at 12.

As mentioned, leave to appeal Justice Gold's decision was denied. Thereupon, petitioners' direct appeal of their convic-

tions went forward, but the convictions were affirmed and petitioners' application to appeal further to the Court of Appeals was denied. The instant petitions then followed.

■ Lemus and Hidalgo, in their instant petitions, allege that they were denied due process of law when: 1) the trial judge failed to grant them a new trial based on newly discovered evidence, which included Pillot's "confession"; 2) the State failed to promptly disclose Rodriguez's eyewitness statement that Pillot and "Spanky" committed the crime; 3) the prosecutor failed to disclose prior to trial that one of the shooting victims, Jeffrey Craig, who testified for the State, had previously been dismissed from the police force, and when this emerged at trial the trial judge denied the defendants' request for production of Craig's police personnel records; and 4) the prosecutor made improper remarks during his summation, including vouching for the reliability of his case and his witnesses.[1]

■ From the foregoing account, it is patent that petitioners' first two points are lacking in merit. With respect to point # 2, while the State arguably should have furnished petitioners' counsel with the new exculpatory evidence sooner than it did, there is no claim that any of this information was known to the State before petitioners' trial, or, conversely, that it was not fully disclosed by the time of the post-trial hearing before Justice Gold: hence, defendants suffered no material prejudice.

■ With respect to point # 1, the post-trial hearing was full and fair in every respect, and Justice Gold's findings—based substantially on his credibility determinations—were supported by substantial

---

1. While the State claims that petitioners have failed to exhaust their state remedies with respect to some of these claims, the Court need not decide this issue since it finds all of petitioners' points defective on the merits. *See* 28 U.S.C. § 2254(b)(2) ("An application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State."). However, the Court agrees with the State that certain further "newly discovered evidence" submitted by petitioners, under seal, as part of the instant petitions is not properly considered by the Court on these petitions.

evidence. While defense counsel would like to portray this case as an instance of innocent men being wrongly convicted, the proof of their guilt was strong and Justice Gold had an ample evidentiary basis for concluding, in effect, that Pillot's inculpatory but inconsistent statements to AUSA Cohen were simply instances of the familiar syndrome of would-be cooperators offering doubtful "confessions" to receptive prosecutors.

■ With respect to point # 3, petitioners do not contend that they made any specific pretrial request for Craig's personnel files, either as a security guard or in connection with his earlier employment as a police officer. Nor, when Craig took the stand at trial, did defense counsel put any question to Craig as to whether he had left his prior employment as a police officer voluntarily or otherwise, or, indeed, any other question about his prior police employment. Subsequently, however, another State witness, police detective Victoria Garcia, volunteered that Craig had been "excused" from the police force for reasons unknown to the witness. At the next recess, defense counsel moved for a mistrial on the ground that if Craig had been dismissed from the force because of misconduct or if his police personnel file contained an incident report of misconduct, this information should have been disclosed as *"Brady"* material. Since this motion for a mistrial rested (and still rests) on no more than extended speculation, the motion was properly denied.

The defense then rejected the suggestion that it recall Craig, but moved instead to have Craig's personnel report produced for the Court's *in camera* inspection. Once again, the Court properly rejected this request as based on extended speculation, and defense counsel made no further inquiries nor sought any other action. Thereafter, the Appellate Division reviewed the matter on direct appeal and found no violation of any kind.

Reviewing the matter now under the much more limited standards of habeas corpus, the Court finds no reason to disturb this conclusion. To this day, petitioners have failed to develop any plausible theory as to how Craig's "dismissal" from the police force might reasonably serve to materially impeach his testimony as to how he came to be shot. In this context, counsel's speculations as to what might be in Craig's prior personnel file provides an insufficient base on which to premise any claim of denial of due process.

■ Finally, with respect to point # 4, although the petitioners complain of various remarks made by the prosecutor in summation, most of the remarks were not even the subject of objections at the time of trial—a telling fact not only because it constitutes waiver for most purposes but also because it evidences how immaterial defense counsel actually perceived most of the allegedly improper comments to be at the time they were actually uttered. Indeed, the Court's own inspection of the remarks in context leads it to conclude that only one could be reasonably claimed to be improper, *viz.*, the prosecutor's statement that "We make selections as to what we feel you should hear because we feel it's reliable." Tr. 1478. This, of course, was improper vouching by the prosecutor, but the statement was immediately followed by curative instructions from Justice Gold, *see* Tr. 1479–80, and similar instructions were repeated to the jury as part of his final charge, *see* Tr. 1522–58. In view of these prompt and repeated curative instructions, the prosecutor's inappropriate but brief comment could not possibly have materially affected the jury or rendered the trial fundamentally unfair.

Accordingly, the petitions for a writ of habeas corpus are denied. Clerk to enter judgment.

SO ORDERED.