**UNITED STATES of America**

**v.**

**Steven CAMACHO and Jaime Rodriguez, Defendants.**

**No. S1294CR.313(CSH).**

United States District Court, S.D. New York.

Oct. 1, 2001.

Mary Jo White, United States Attorney for the Southern District of New York (Sharon L. McCarthy, of counsel), New York City, for U.S.

Joshua L. Dratel, P.C., New York City, for Steven Camacho.

Joyce C. London, New York City, for Jaime Rodriguez.

## MEMORANDUM OPINION AND ORDER

HAIGHT, Senior District Judge.

Steven Camacho and Jaime Rodriguez were convicted of various racketeering acts

in June of 1996 and now move pursuant to Rule 33 of the Federal Rules of Criminal Procedure for a new trial on the basis of newly discovered evidence. Defendants submit an affidavit by Christopher E. Thomas, a federal prisoner, that describes a conversation in which Gregory Cherry, a fellow inmate, stated that defendants were convicted of crimes that Cherry committed. Defendants request that the Court grant a new trial based on Cherry's statement. Defendants argue that Cherry should be granted judicial immunity so that he may testify or, in the alternative, that testimony by Thomas regarding Cherry's self-inculpation would be admissible under Federal Rule of Evidence 804(b)(3). In either event, defendants contend that Cherry's declarations entitle them to a new trial.

On July 10, 2001, the Court ordered the defendants and the government to submit supplemental briefs addressing the question of whether the Court has jurisdiction pursuant to Rule 33 of the Federal Rules of Criminal Procedure. Having received the parties' supplemental briefs, I now consider defendants' motion. For the reasons that follow, I determine as a threshold matter that this Court does have jurisdiction. On the merits, I deny defendants' request for a grant of judicial immunity, and I direct a hearing for the purposes of assessing whether testimony by Thomas regarding Cherry's statements would be admissible and, if so, whether a new trial is required.

## BACKGROUND

Camacho and Rodriguez were indicted on racketeering charges on May 25, 1994, along with multiple other defendants as part of the federal prosecution of members of the C & C gang, which operated in the Bronx. Early in the case, the government agreed to try Camacho and Rodriguez separately from the others, and accordingly they were severed from the primary case. After securing guilty pleas from numerous defendants and agreeing to additional severances, the government initially proceeded to trial against Angel Padilla, one of the founders of the C & C gang, and Ivan Rodriguez, the man accused of killing the other founder, Juan Calderon. Both Padilla and Ivan Rodriguez were convicted in May of 1995.

Camacho and Jaime Rodriguez were later tried pursuant to a superseding indictment dated February 12, 1996. They were charged at trial with conspiracy to murder Hector Ocasio, the murders of Hector Ocasio and Gilberto Garcia, and the attempted murder of Luis Garcia, all in aid of the C & C racketeering enterprise, in violation of 18 U.S.C. § 1959; they were also charged with a related firearms offense in violation of 18 U.S.C. § 924. A jury trial commenced on June 3, 1996. The government advanced the following theory of how the murders and attempted murder took place: After Calderon was killed, Padilla told the members of his security force to keep a low profile and brought in a new head of security, Hector Ocasio, who hired new security members. Soon, Padilla and several longtime members of his security force, including James Albizu, Joey Pillot, Trumont Williams, and Gregory Cherry,[1] began to distrust Ocasio. Ocasio had reduced weekly salaries and then cut several security members from the payroll. He also had given local drug dealers permis-

---

1. The members of the C & C gang were frequently referred to at trial by their nicknames: Albizu-"Pito," Pillot-"Joey," Williams-"Tree," and Cherry-"G" or "Ninja." Camacho and Rodriguez were sometimes referred to respectively as "Spanky" and "Jay"; two other indicated defendants appear to have the same nicknames (James Rodriguez-"Spanky" and James Boggio-"Jay").

sion to shoot Williams and Cherry. Albizu conceived of a plan to murder Ocasio, and he discussed his plan with Pillot, Williams, and Cherry. He also discussed his plan with Camacho and Rodriguez, who together used to pay C & C "rent" to sell drugs in the gang's neighborhood and were friendly with Albizu. In late December of 1992, Albizu, Williams, Cherry, Camacho, Rodriguez, and a cousin of Rodriguez's agreed to meet to kill Ocasio, but the plan fell through when Cherry failed to appear.

According to the government's theory, the plan to kill Ocasio was brought to fruition on January 2, 1993. On that day, Albizu, Camacho, and Rodriguez met Williams at his apartment. Williams called his regular car service driver, Douglas Welch, and for several hours, Welch drove the group around as they prepared to murder Ocasio. During that time, they collected weapons and obtained ammunition. They then located Ocasio, who was standing in front of a liquor store with Gilberto Garcia and Luis Garcia. Albizu went to collect his weekly salary from Ocasio and returned to the car. The group then met up with Cherry, who helped Albizu and Williams hijack an additional car. Albizu parked the hijacked car a few blocks from the liquor store, and Cherry left. Welch drove Albizu, Williams, Camacho, and Rodriguez around the neighborhood and then dropped off Albizu a few blocks from the liquor store. Welch then drove around for a few more minutes and parked half a block from the liquor store. Williams and Camacho exited the car while Rodriguez waited with Welch. Williams and Camacho then shot Ocasio, Gilberto Garcia, and Luis Garcia.

Ocasio and Gilberto Garcia were killed. Luis Garcia was wounded. Camacho returned to the car, and Williams left in a different direction. Welch drove Camacho and Rodriguez away, and they regrouped with Williams and Cherry, who had the hijacked car. The next day, Camacho and Rodriguez met with Albizu and talked about the murders.

The principal witnesses for the government on the issue of defendants' participation in the shootings were Albizu and Welch, who testified to the sequence of events described above.[2] The defense attacked these witnesses' credibility by calling attention to the ruthless, self-serving acts committed by Albizu in connection with prior crimes and by arguing that Albizu and Welch were providing testimony to please the prosecutors in order to obtain leniency. Albizu had originally been indicted along with the defendants and had accepted a plea bargain pursuant to which he was sentenced to time served plus 60 days. In exchange for his cooperation, Welch was never prosecuted. The government also called defendants' former partner in their drug sales business, Jose Crespo, to testify as a background witness. Finally, the government called several police officers as witnesses.

Defendants each presented an alibi witness at trial. Venero Jimenez testified that Camacho was visiting his mother in Florida from a few days after Christmas in 1992 until approximately three weeks later. Nancy Melendez, Rodriguez's former girlfriend and the mother of his child, testified that Rodriguez came to her apartment the evening of January 1, 1993, and

---

**2.** There were several discrepancies in the extensive narratives of these two witnesses at trial. For example, Albizu did not mention the hijacking in the sequence of events preceding the murders, but he did describe the hijacking as occurring on another day. Also,

Welch but not Albizu recalled that Rodriguez had obtained bullets on the day of the murders. The government in summation urged the jury to find Welch's version of the facts more accurate.

stayed the entire day and evening of January 2, 1993. The government tried to show that the witnesses were trying to help the defendants out of concern for them and argued that their stories were patently incredible. Defendants also presented as a witness Luis Garcia, the surviving victim of the shootings. Garcia testified that he saw Williams and Cherry, not Williams and Camacho, commit the shootings. He also testified that he encountered Cherry several days after he was released from the hospital and that Cherry told him that he was not the intended target of the shootings. On cross-examination, the government elicited from Garcia that he only glimpsed the shooters in the brief moment after he was shot in the back, as he turned and fell to the ground, and that he only saw the profile of the shooter whom he identified as Cherry. The government also tried to discredit Garcia by pointing to ballistics evidence to show that Garcia was mistaken about who was shot by Williams and who was shot by the second assailant.

To rebut Camacho's alibi defense that he was in Florida during the first weeks of January 1993, the government called as a rebuttal witness a parole officer who testified that Camacho met with her in the Bronx on January 6, 1993. The government also introduced a court transcript showing that Camacho appeared in court in the Bronx on January 7, 1993. Finally, the government called two New York City police detectives who testified that they had interviewed Garcia after the shootings and that Garcia told them at that time that he did not know who shot him.

On June 26, 1996, the jury returned a verdict of guilty on all counts against both Camacho and Rodriguez. Defendants immediately submitted a motion for a judgment of acquittal and, alternatively, for a new trial on the basis of insufficient evidence and various other grounds. The Court denied their motion. *United States v. Camacho*, No. S12 94 Cr. 313, 1998 WL 472844 (S.D.N.Y. Aug. 10, 1998). In April of 1999, defendants filed a second motion for a new trial based on newly discovered evidence (the "second motion"). Defendants requested a grant of judicial immunity so that a proposed witness, Gregory Cherry, could testify that he committed the crimes for which defendants were convicted. Counsel for Rodriguez had met with Cherry in the fall of 1997 and the fall of 1998 and stated in an affidavit that Cherry told her that he knew who was responsible for the murders and that Camacho and Rodriguez were not involved. Cherry told her that he would testify only if he was granted immunity. Defendants also argued in their second motion that a new trial was warranted because of prosecutorial misconduct. The Court declined to grant judicial immunity and found that there was no newly discovered evidence of prosecutorial misconduct that would warrant a new trial. *United States v. Camacho*, No. S12 94 Cr. 313, 1999 WL 1084229 (S.D.N.Y. Dec. 1, 1999). Judgment was entered against Rodriguez on April 11, 2000, and he filed a notice of appeal on April 20, 2000. Judgment was entered against Camacho on June 19, 2000, and he filed a notice of appeal on June 21, 2000.

During the late summer or fall of 2000, counsel for defendants received an affidavit by a federal inmate named Christopher E. Thomas (also known as Christopher E. Reese). Thomas's affidavit is dated July 14, 2000, and attests to the following events: Around June of 1998, Thomas was incarcerated at the federal prison in Otisville and frequently visited the prison law library. He became acquainted with Gregory Cherry, who was working in the law library, and began helping him with papers

related to his sentencing proceedings.[3] One day, Thomas was sitting with Cherry when Steven Camacho walked into the library. Thomas commented to Cherry that he remembered Camacho but thought that Camacho did not remember him, since Camacho did not greet him. Cherry then stated that Camacho was his codefendant and was in prison for something that Cherry did. When Thomas asked Cherry what he meant, Cherry responded "bodies." Cherry also mentioned that he had told an attorney that Camacho and another person were innocent of the charges against them. Thomas did not tell anyone about the conversation until July 13, 2000, when he told Camacho. In Thomas's affidavit, dated July 14, 2000, he states that he is willing to testify in connection with Camacho's criminal case.

The Second Circuit Court of Appeals permitted defendants to withdraw their appeals without prejudice so that defendants could make a third motion before this Court for a new trial. That motion was filed on March 30, 2001.[4]

## DISCUSSION

### I. *Jurisdiction*

At the Court's direction, the defendants and the government have submitted supplemental memoranda of law addressing the issue of the Court's jurisdiction as governed by Rule 33 of the Federal Rules of Criminal Procedure. That direction was explained in the Court's opinion dated July 10, 2001, which laid out the jurisdic-

tional issue raised by defendants' motion, *Unites States v. Camacho,* S12 94 Cr. 313, 2001 WL 789301 (S.D.N.Y. July 11, 2001); I restate the circumstances in full for the sake of clarity.

Rule 33 limits the time within which a defendant in a criminal case may move for a new trial. A district court has jurisdiction to consider a motion for a new trial only if the motion is submitted within the time limits established by Rule 33. *United States v. Lussier,* 219 F.3d 217, 220 (2d Cir.2000). When the trial in this case took place in 1996, Rule 33 required that a motion for a new trial based on newly discovered evidence be filed within two years of "final judgment." If a defendant appeals unsuccessfully from a conviction, "final judgment" occurs when the Court of Appeals issues its mandate. *Lussier,* 219 F.3d at 218–19, *reaffirming United States v. Reyes,* 49 F.3d 63 (2d Cir.1995). On December 1, 1998, an amendment to Rule 33 went into effect and changed the time limits applicable to motions for a new trial in criminal cases. The rule now provides that a motion for a new trial based on newly discovered evidence must be filed within three years of the verdict.[5]

Defendants' motion for a new trial based on newly discovered evidence would be timely under the version of Rule 33 in effect prior to December 1, 1998, but it would be late under the current version of the rule. The jury announced its verdicts on June 26, 1996. Defendants filed this

---

3. Cherry was sentenced on September 24, 1998, pursuant to a plea bargain, to twenty-five years in prison.

4. Camacho's motion for a new trial was filed with the Court on March 30, 2001. Rodriguez's motion was not officially served and filed with the Court until July 2, 2001, although the Court had received a courtesy copy of the motion well prior to that date.

5. The 1998 amendment did not alter the time limits applicable to motions for a new trial on grounds other than newly discovered evidence. Such motions must be made "within 7 days after the verdict or finding of guilty or within such further time as the court may fix during the 7-day period." Fed.R.Crim.P. 33.

motion on March 30, 2001.[6] Since defendants have not yet completed their appeal, there has been no "final judgment" in this case, and therefore the time for making a motion for a new trial under the prior version of Rule 33 has not yet expired. Under the current version of Rule 33, however, the time for filing a motion for a new trial would have expired on June 26, 1999, three years after the verdict.

The question whether the amended version of Rule 33 should apply in circumstances such as are present in this case is a matter of first impression. *See Lussier,* 219 F.3d at 218–19 (not deciding whether amended Rule 33 applies to motion for new trial filed before effective date of amendment); *see also United States v. Bowler,* No. 99–31370, 2001 WL 568714, at *2–5 (5th Cir. May 25, 2001) (dealing with case in which verdict was reached more than three years before effective date of amendment to Rule 33); *United States v. Soler,* No. 94 Cr. 533, 2000 WL 385514, at *1 (S.D.N.Y. Apr. 17, 2000) (same); *United States v. Jasin,* No.Crim. 91–602–08, 2000 WL 1793397, at *2 (E.D.Pa. Nov. 22, 2000) (same).

■ Amendments to a rule of procedure generally apply to cases commenced after the effective date of amendment and also may apply to some pending cases "insofar as just and practicable." *Bowler,* 252 F.3d 741, 744–47, *interpreting* Order of April 24, 1998 of the Supreme Court of the United States Adopting and Amending the Federal Rules of Criminal Procedure, 523 U.S. 1229. The trial of the case at bar ended with the jury's guilty verdicts on June 26, 1996, nearly a year and a half before the amendments to Rule 33 came into effect on December 1, 1998. Therefore, the amendment to Rule 33 should be

applied in this case only if it is just and practicable to do so.

Defendants and the government offer several reasons why it would or would not be just and practicable to apply the new version of Rule 33 in this case. For the most part, their arguments miss the mark. Defendants contend that they have no control over the emergence of new facts and that their motion is meritorious; they also assert that resolution of their motion by the trial court would avoid piecemeal litigation through appeals and habeas petitions. These arguments do not in the slightest distinguish defendants' motion from other motions based on newly discovered evidence under Rule 33. In essence, defendants are arguing that it is unjust and impracticable to impose any time limit on a motion for a new trial based on newly discovered exculpatory evidence and, therefore, that the least restrictive time limit should apply. I must perforce accept the contrary proposition implicit in the drafters' revision of Rule 33–that it is just and practicable to impose definite time limits, running from the date of the verdict, on motions for a new trial based on newly discovered exculpatory evidence. I am not persuaded that the former version of Rule 33 should apply merely because it is more permissive than the current version of Rule 33.

Defendants and the government also debate the significance of the fact that defendants raised similar issues in their second motion for a new trial. I do not find these arguments to be helpful on the question whether it would be "just and practicable" to apply the current version of Rule 33 in this case. Defendants' motion is based on newly discovered evidence, statements by Gregory Cherry to Christopher Thomas, which defendants could not have included in their prior motion. Rule 33 does not

---

**6.** See supra note 4.

restrict the number of motions a defendant may make, nor does it treat as relevant whether a motion for a new trial based on newly discovered evidence makes similar arguments as a prior motion based on other new evidence. Either version of Rule 33 effectively prohibits trial courts from considering new evidence that is discovered after a certain period of time has elapsed. Defendants could not have brought evidence of Cherry's statement to Thomas to the Court's attention within three years of the verdict, as the current version of Rule 33 requires. As I stated earlier, there is nothing inherently unjust or impracticable in the more restrictive time limit imposed by the current version of Rule 33, nor could it be argued (and defendants do not argue) that this revision of Rule 33 lay beyond the powers of the drafters.

Defendants make the further argument that their motion relates back to their second motion for a new trial and that therefore the time limit of Rule 33 only applies to the filing of their second motion. Defendants' second motion for a new trial

was timely filed under either version of the rule. Rule 33 does not provide an exception to its time limit for motions that relate to earlier motions, nor does it give courts discretion to grant additional time for defendants to file motions for a new trial based on newly discovered evidence, although the rule does give courts such discretion with regard to motions for a new trial made on other grounds. *See* Fed. R.Crim.P. 33 ("A motion for a new trial based on any other grounds may be made only within 7 days after the verdict or finding of guilty or within such further time as the court may fix during the 7–day period."); Fed.R.Crim.P. 45(b) ("[T]he court may not extend the time for taking any action under Rules 29, 33, 34 and 35, except to the extent and under the conditions stated in them."). The time limits imposed by Rule 33 must be "strictly construed." *Herrera v. Collins,* 506 U.S. 390, 409, 113 S.Ct. 853, 122 L.Ed.2d 203 (1993). Defendants' motion cannot be treated as a timely amendment or supplement to their second motion, since the Court has already ruled on that motion.[7] Nor can defen-

---

**7.** In certain circumstances, a defendant may be permitted to amend or supplement a motion for a new trial after the time limit under Rule 33 has expired, as long as the amendment or supplement does not assert additional grounds for the motion. *See United States v. Flynn,* 196 F.3d 927, 931–32 (8th Cir.1999); *United States v. Holt,* 170 F.3d 698, 702–03 (7th Cir.1999); *United States v. Custodio,* 141 F.3d 965, 966 (10th Cir.1998); *United States v. Greene,* 971 F.Supp. 1117, 1138–42 (E.D.Mich.1997) (citing cases from several courts of appeal). The courts that have dealt with this issue have done so with respect to the seven-day limit for motions made on grounds other than newly discovered evidence, and those courts have looked to whether the late filing made new allegations, claims, or arguments regarding the conduct of the trial to determine whether to treat that filing as supplement to a prior motion or as a new motion. *Flynn,* 196 F.3d at 931–32; *Holt,* 170 F.3d at 702–03; *Custodio,* 141 F.3d at 966; *Greene,* 971 F.Supp. at 1140–41.

Courts have not yet considered what would constitute additional grounds in a motion based on newly discovered evidence, for purposes of deciding whether to consider filings made after the jurisdictional time limit had expired, but I am inclined to think that for this sort of motion, new evidence would constitute additional grounds. *Cf. United States v. Quintanilla,* 193 F.3d 1139, 1146–47 (10th Cir.1999) (refusing to apply more generous standard of review applicable to motions filed within seven days of verdict where defendant filed boilerplate motion for new trial based on newly discovered evidence within seven days and then asked court to refrain from ruling while he gathered new evidence). I need not determine, however, whether the new evidence defendants present in this motion constitutes additional grounds, because, as I state in the text, it is too late for defendants to amend their prior motion or even request reconsideration of the Court's decision on that motion.

dants' motion be treated as a timely request for reconsideration of the Court's decision on the second motion, since defendants made this motion nearly sixteen months after the Court's decision on the second motion and nearly nine months after the Court entered judgment and the defendants filed their notices of appeal. *See United States v. Clark,* 984 F.2d 31, 33–34 (2d Cir.1993) ("[T]he filing of a request for reconsideration [is] timely, in the absence of any specified time limit, if filed within the time for appeal...."); Fed. R.App. P. 4 (providing ten days for defendant in criminal case to file notice of appeal of order or judgment); *cf. Canale v. United States,* 969 F.2d 13, 14–15 (2d Cir. 1992) (addressing timeliness of motion for reconsideration filed by government). Therefore, defendants' present motion must be treated as their third motion for a new trial.

On the issue of whether it is just and practicable to apply the new version of Rule 33 in this case, the determinative question is not whether the new version of Rule 33 is itself just and practicable; rather it is whether that version can be applied in cases presenting comparable chronologies in a manner that is predictable, uniform, and consistent with the purposes of the rule. *See* Fed.R.Crim.P. 2 ("These rules .... shall be construed to secure simplicity in procedure, fairness in administration and the elimination of unjustifiable expense and delay."). I find that it would not be just or practicable to apply the new version of Rule 33 in this case, where the verdict was reached before the amendments to Rule 33 came into effect, because the time period prescribed by the new version of the rule runs from the date of the verdict.

Defendants were convicted by the jury on June 26, 1996. If they had consulted Rule 33 on that date to determine how much time they had to file a motion for a new trial, they would have learned that they could file a motion for a new trial based on newly discovered evidence at any time before final judgment or for two years thereafter. Defendants filed this motion on March 30, 2001,[8] before the Second Circuit heard their appeal and thus before "final judgment." The amendments to Rule 33, imposing a new time limit based on the date of the verdict, became effective on December 1, 1998. Under the new rule, defendants would have been barred from submitting a motion for a new trial after June 26, 1999, that is three years after the verdict. It would be unfair to apply the new rule to defendants, because it would interject an unexpected deadline into the post-trial process. Defendants should be able to rely on the rule governing motions for a new trial that was in effect on the date they were convicted. Furthermore, application of the new rule in cases such as this one, where the verdict was reached before December 1, 1998, would have inconsistent effects. As of the effective date of amendment, some defendants would suddenly have only a few days or weeks to file their motions, while other defendants would have up to three years. Rule 33 should be applied in a manner to provide defendants in criminal trials with clear advance notice of their deadlines for filing post-trial motions. For this reason, I conclude that it makes sense and would be most just to apply the version of Rule 33 in effect on the date of the verdict, in this case the former version of Rule 33 providing a deadline of two years after final judgment.

Other courts have applied the version of Rule 33 in effect on the date of the verdict in circumstances where the defendants

---

8. See supra note 4.

were convicted more than three years prior to the effective date of amendment of Rule 33. A district court in this circuit, in so holding, explained:

> [A]t the time of the verdict [Rule 33] provided that such a motion could be made within two years following final judgment. The amendment of the rule did not become effective until December 1, 1998, more than three years after the verdict.
>
> It would be entirely anomalous to apply the current time limit to defendant's motion. Doing so would mean that Soler's motion was barred before the revision of Rule 33 even came into effect. Soler surely had a right to rely on the old version of Rule 33 as long as it was effective. There is no sensible and fair way to apply the new rule to him. The old rule must govern, and under that rule the motion is timely.

*United States v. Soler*, No. 94 Cr. 533, 2000 WL 385514, at *1 (S.D.N.Y. Apr. 17, 2000) (Griesa, J.); *accord Bowler*, 252 F.3d 741, 743–747 ("It would not be just and practicable to apply the new rule to [this] Rule 33 motion because that would have required Bowler to file the motion five months before the effective date of the new rule."); *Jasin*, 2000 WL 1793397, at *2 ("[T]he Court will apply to this case the rule relating to new trials based on newly discovered evidence as it existed when defendant was convicted, not as amended while his conviction was on appeal."). While application of the new version of Rule 33 would have been more harsh for the defendants in *Soler*, *Bowler*, and *Jasin* than it would be for Camacho and Rodriguez, since the defendants in those cases would have had no notice that their time for filing motions would be curtailed, I am convinced that the principle articulated in those cases has force in this case as well; defendants should be entitled to rely on

the version of the rule governing motions for a new trial that was in effect at the close of their trial. This result is just and practicable because it ensures the predictable and uniform application of Rule 33, so that the rule may function to provide criminal defendants with clear notice of the time period for filing motions for a new trial. Therefore, I find that this court has jurisdiction to consider defendants' motion.

## II. *Judicial Immunity*

▮ In an opinion dated December 1, 1999, the Court denied defendants' request for a grant of judicial immunity for Gregory Cherry. *United States v. Camacho*, No. S12 94 Cr. 313, 1999 WL 1084229, at *3–7 (S.D.N.Y. Dec. 1, 1999). A court may order the government to grant a defense witness immunity or risk dismissal of the charges against the defendant only if three requirements are met:

> *First,* the district court must find that the government has engaged in discriminatory use of immunity to gain a tactical advantage or, through its own overreaching, has forced the witness to invoke the fifth amendment. *Second,* the witness's testimony must be material, exculpatory, and not cumulative. *Third,* the testimony must be unobtainable from any other source.

*Id.* at *3–4 (quotations omitted), *citing and quoting United States v. Bahadar*, 954 F.2d 821, 826 (2d Cir.1992). The Court found that while Cherry's proposed testimony would be exculpatory and was not obtainable from any other source, defendants had not shown that the government's denial of immunity constituted overreaching or improper discrimination. *Id.* at *5–7; *see also United States v. Bahadar*, 954 F.2d 821, 826 (2d Cir.1992) ("[Ali's] invocation of the fifth amendment was not the result of a discriminatory use of immunity by the government, nor of any other prosecutorial overreaching. In fact,

it seemed to be solely the result of Ali's own willingness to change his story.").

Defendants now ask the Court to reconsider its refusal to grant judicial immunity to Cherry, but defendants fail to provide any evidence of prosecutorial misconduct that they did not provide, or could not have provided, in connection with their prior motion. Rodriguez argues that Thomas's affidavit shows that the government abused its prosecutorial discretion, and Camacho argues that Thomas's affidavit demonstrates a "compelling need" for immunity. These arguments are without merit. The affidavit by Thomas confirms the exculpatory nature of Cherry's proposed testimony, which the Court has already recognized. *Camacho*, 1999 WL 1084229, at *5. Thomas's affidavit does not, however, contain any information about government misconduct. Although defendants offer only Thomas's affidavit as new evidence justifying reconsideration of the Court's prior decision, Rodriguez recites numerous other allegations of misconduct. Camacho Mem. of Law at 3; Rodriguez Mem. of Law at 18–22; Rodriguez Reply Mem. of Law at 5–8. Some of these allegations are not based on new evidence, and the rest are not based on any evidence at all.[9]

Counsel for Rodriguez suggests that the Court in its opinion of December 1, 1999, mistakenly applied the newly discovered evidence requirement to defendants' request for judicial immunity. Reply Mem. of Law. at 6. Counsel confuses the two grounds of decision in the Court's opinion. Defendants had requested a new trial based on proposed testimony by Cherry, which they hoped to obtain through a grant of judicial immunity, and, in the alternative, based on a pattern of prosecutorial misconduct. *Camacho*, 1999 WL 1084229, at *2. In considering defendants' request for a grant of judicial immunity, the Court did not require that evidence of prosecutorial misconduct be newly discovered. *Id.* at *2–7. The Court did apply such a requirement, however, in considering defendant's argument that a pattern of prosecutorial misconduct warranted a new trial. *Id.* at *8.

While defendants do not argue that the legal standards governing judicial grants of immunity have changed, Rodriguez does rely on *United States v. Dolah*, 245 F.3d 98 (2d Cir.2001), an opinion issued by the Second Circuit subsequent to this Court's opinion of December 1, 1999. Counsel misrepresents that case as holding that " 'discriminatory use of grants of immunity' means only that the government has conferred immunity on some witnesses and not on others." Reply Mem. of Law at 6. In fact, the Court in *Dolah* stated:

"The "discriminatory use" component of the test is not entirely clear. It is arguable that this component ... means simply a decision by the Government to

---

**9.** Counsel for Rodriguez challenges the government's strategy, in its prosecution of the C & C gang, of negotiating plea bargains and cooperation agreements with certain defendants while proceeding to trial against other defendants. Counsel also offers as Exhibit A to her memorandum of law a list entitled "Examples of Prosecutorial Misconduct." The factual allegations in Exhibit A are not supported by any sworn affidavits or other evidentiary documents, and all but two of the allegations in Exhibit A concern government actions prior to or during defendants' trial.

The other two allegations concern the government's failure to investigate Cherry's role in the shootings on January 2, 1993, after hearing the testimony at trial by Luis Garcia, and the government's failure to advise defendants that a cooperating witness in an "unrelated" prosecution of C & C members may have committed perjury. It is worth noting that the confession that was offered as evidence of perjury in the unrelated case was found not credible by a state court, and that finding was upheld on habeas review. *Lemus v. Artuz*, 131 F.Supp.2d 532, 535–36 (S.D.N.Y.2001).

confer immunity on some witnesses and not on others. . . . On the other hand, . . . 'tactical advantage' might mean something more than merely selecting from among potential witnesses those who will receive immunity."

*Id.* at 105–06. The court did not set any new standard for reviewing denials of immunity by prosecutors but rather summarized and affirmed existing precedent, in particular noting that interference with the power of prosecutors to grant or deny immunity was permissible only in "limited circumstances." *Id.* at 106. The court then held that it was fundamentally unfair for the government in that case to immunize select witnesses while introducing the plea allocations of similarly situated witnesses whose testimony would have been less favorable to the government. *Id.* at 107. Counsel for defendants do not argue that the misconduct alleged in this case is comparable to the misconduct alleged in *Dolah.*

The issue of judicial immunity was considered at length in the opinion of December 1, 1999, and I find no persuasive reason to reconsider the issue now. Therefore, defendants' request for judicial immunity for Gregory Cherry is denied.

## III. *The Merits of Defendants' Motion for a New Trial*

The Court having declined to grant judicial immunity to Cherry, the new evidence upon which defendants base their motion for a new trial perforce consists of Thomas's account of his conversation with Cherry. That account presently takes the form of the affidavit defense counsel have obtained from Thomas, setting forth the declarations that Thomas attributes to Cherry. In these circumstances, three questions arise:

(1) Would the declarations Thomas attributes to Cherry be admissible under the rules of evidence at a new trial? If that question be answered in the negative, then the defendants' motion fails of necessity, since this is the only new evidence defendants have to support it.

(2) If the rules of evidence would permit Thomas to testify to Cherry's declarations in a manner consistent with Thomas's affidavit, do Cherry's declarations entitle defendants to a new trial?

(3) Is an evidentiary hearing necessary to resolve these issues, or should the Court adjudicate the motion on the basis of the present written submissions?

I will consider these questions in order.

### A. *Admissibility*

Defendants offer Cherry's out-of-court declarations to Thomas "to prove the truth of the matter asserted," Fed.R.Evid. 801(c), namely, that Cherry and Williams, not Camacho and Williams, shot Ocasio, Gilberto Garcia, and Luis Garcia. Accordingly, under that rule, Cherry's declarations are hearsay, and could be admitted at a new trial only if they fall within a recognized exception to the hearsay rule.

Defendants rely upon the exception found in Rule 804(b)(3). That Rule provides:

(b) **Hearsay exceptions.** The following are not excluded by the hearsay rule if the declarant is unavailable as a witness:

. . . . .

(3) **Statement against interest.** A statement which was at the time of its making so far contrary to the declarant's pecuniary or proprietary interest, or so far tended to subject the declarant to civil or criminal liability, or to render invalid a claim by the declarant against another, that a reasonable person in the declarant's position would not have made the statement unless believing it

to be true. A statement tending to expose the declarant to criminal liability and offered to exculpate the accused is not admissible unless corroborating circumstances clearly indicate the trustworthiness of the statement.

Defendants who offer hearsay evidence that another person has confessed to the crime must establish three elements in order to prevail on the issue of admissibility: "(1) the declarant is unavailable; (2) the statement was at the time of its making against the declarant's (penal) interest; and (3) corroborating circumstances clearly indicate the trustworthiness of the statement." *United States v. Rodriguez,* 706 F.2d 31, 40 (2d Cir.1983).

■ It is undisputed that Cherry would be "unavailable" under Rule 804 if he were called to testify and invoked his Fifth Amendment privilege against self-incrimination. Rule 804(a)(1) provides that a declarant is "unavailable" if he is "exempted by ruling of the court on the ground of privilege from testifying." *See United States v. Dolah,* 245 F.3d 98, 102 (2d Cir. 2001) ("It is settled in this Circuit that a witness who invokes the privilege against self-incrimination is "unavailable" within the meaning of Rule 804(b) ...."); *see also United States v. Bahadar,* 954 F.2d 821, 827 (2d Cir.1992). The government also concedes that Cherry's statement to Thomas was against penal interest, because it tended to subject him to criminal liability. Gov. Mem. of Law at 5–6. *See United States v. Katsougrakis,* 715 F.2d 769, 777–78 (2d Cir.1983) (articulating broad definition of statements against penal interest); *United States v. Thomas,* 571 F.2d 285, 288 (5th Cir.1978) (same); *United States v. Satterfield,* 572 F.2d 687,

691 (9th Cir.1978) (same); *but cf. United States v. Silverstein,* 732 F.2d 1338, 1346 (7th Cir.1984) (suggesting that self-inculpatory statements by convict serving multiple life sentences may not be against penal interest).[10] The only point of contention between the parties is whether Cherry's statement to Thomas is clearly corroborated by circumstances indicating its trustworthiness.

### 1. *The Requirement of Clear Corroboration*

"Although Rule 804(b)(3) requires the presence of corroborating circumstances only in the case of statements 'tending to expose the declarant to criminal liability and offered to exculpate the accused,' this Circuit requires corroborating circumstances even when the statement is offered ... to *inculpate* the accused." *United States v. Casamento,* 887 F.2d 1141, 1170 (2d Cir.1989). With respect to exculpatory statements, the purpose of the corroboration requirement is to prevent criminal accomplices from fabricating evidence at trial. *United States v. Rodriguez,* 706 F.2d 31, 40 (2d Cir.1983) (citing legislative history of Rule 804(b)(3)); *United States v. Guillette,* 547 F.2d 743, 754 (2d Cir.1976) (noting "inherent danger that third party confessions tending to exculpate a defendant are the result of fabrication"); *United States v. Silverstein,* 732 F.2d 1338, 1346 (7th Cir.1984) (commenting on "long-standing concern-whether or not well-founded-that a criminal defendant might get a pal to confess to the crime the defendant was accused of, the pal figuring that the probability of his actually being prosecuted either for the crime or for perjury was

---

**10.** The Second Circuit has frequently refrained from articulating the limits of the "against penal interest" requirement and instead decided cases based on the corroboration requirement. *See, e.g., United States v. Doyle,* 130 F.3d 523, 543 n. 16 (2d Cir.1997); *United States v. Bahadar,* 954 F.2d 821, 829 (2d Cir.1992); *United States v. Salvador,* 820 F.2d 558, 561 (2d Cir.1987); *United States v. Rodriguez,* 706 F.2d 31, 40 (2d Cir.1983).

slight.") (citation omitted). "The burden is on the accused to justify admission of the statement by demonstrating that the statements are sufficiently corroborated." *United States v. Doyle*, 130 F.3d 523, 543–44 (2d Cir.1997), citing *United States v. Salvador*, 820 F.2d 558, 561 (2d Cir.1987).

The requirement of corroboration is easy enough to state in general terms, but the Second Circuit cases have led to some uncertainty with respect to its particular application. Thus in *Salvador*, where the Second Circuit affirmed the trial judge's exclusion of an exculpatory declaration because "the indicia of reliability are far too insufficient to warrant admission," 820 F.2d at 562 (quoting the trial judge), the court of appeals said:

> Exactly what needs to be corroborated, though, is not absolutely clear from the rule or much of the case law. Corroboration of the trustworthiness of the statement could mean that the district judge is to require corroboration of the of the declarant's trustworthiness, focusing on declarant's reliability when the statement was made, or corroboration of the truth of the declarant's statement, focusing on whether the evidence in the record supported or contradicted the statement, or both. Our court seems to require corroboration of both.

820 F.2d at 561–62 (citations omitted). That conclusion was reiterated in *United States v. Bahadar*, 954 F.2d 821 (2d Cir. 1992), affirming the exclusion of an arguably exculpatory hearsay declaration because "[t]he circumstances simply do not corroborate the trustworthiness of the proffered statement at all," *id.* at 829; the Second Circuit said:

> The corroboration requirement of the Rule should be construed to effectuate its purpose of circumventing fabrication. To this end, our cases have required corroboration of both the *declarant's*

trustworthiness as well as the *statement's* trustworthiness.

*Id.* (citation and internal quotation marks omitted) (emphases in original).

However, more recently in *Doyle*, 130 F.3d 523, the Second Circuit suggested a different analysis, manifested by the court's seemingly approving quotation from Judge Weinstein's treatise. The *Doyle* court, after quoting the passages from *Salvador* and *Bahadar* that I have quoted *supra*, went on to say at 130 F.3d at 544:

> On the other hand, 5 *Weinstein's Federal Evidence* § 804.06[5][c] states that "[i]t is the statement, not the witness or the declarant, that must be trustworthy." As the treatise notes, "[t]he corroboration requirement should not be used as a means of usurping the jury's function" of evaluating the credibility of witnesses. *Id.*

(emphasis added). In *Doyle* the Second Circuit, having paid that apparent tribute to Weinstein's analysis, then offered a further discussion which is, in large measure, an apologia for its prior decisions in *Salvador* and *Bahadar*:

> In any event, the credibility of an absent declarant is a consideration pertinent to the probative value of her or his testimony and, thus, relevant to a judge's decision to admit or exclude evidence under the ever-vigilant Fed.R.Evid. 403, *even if not a proper question for the judge under Rule 804.* Accordingly, our circuit's position, as stated in *Salvador* and *Bahadar, can be justified* as a proper exercise of the trial judge's discretionary authority under a combination of Rules 804 and 403.

130 F.3d at 544 (emphases added).

*Doyle* was a prosecution for the illegal exportation of equipment in violation of an embargo of trade with Libya. At trial co-

defendants Doyle and Vance, invoking Rule 804(b)(3), offered into evidence unsworn statements of one Nothacker, a West German middleman, to government agents investigating the transaction. Nothacker had said to the agents that "he never informed Doyle that Libya was the ultimate purchaser of the parts supplied by the [defendants]." 130 F.3d at 542. The trial judge "found both that Nothacker was unavailable to testify at trial, and that the statements he made were against his penal interest," but excluded the statements "for lack of indications of trustworthiness in the circumstances surrounding the statement, as required by F.R.Evid. 804(b)(3)," *id;* "Nothacker's statements were offered by the defense to exculpate Doyle and Vance and are, therefore, subject to the last sentence of Rule 804(b)(3), which requires that 'corroborating circumstances *clearly* indicate the trustworthiness of the statement,' " *id.* at 543 (emphasis is the court's). The trial judge excluded Nothacker's statements because they "were expressly recanted in a stipulation executed as part of the corporate plea agreement between the Government and ISP [Nothacker's company]." *Id.* at 542. The Second Circuit, affirming that ruling, noted the discrepancies in Nothacker's statements and also looked to the trial record for evidence corroborating or contradicting one version or the other. The court said:

> Given that the other evidence at trial supported Nothacker's later statement and contradicted his earlier assertions that he never discussed the identity of the ultimate purchaser with Doyle, we easily conclude that the district court cannot be faulted for excluding the statements.

*Id.* at 544.

The most recent Second Circuit case is *United States v. Desena,* 260 F.3d 150 (2d Cir.2001). The prosecution arose out of the criminal activities of the Pagans, a motorcycle club, to which defendant-appellant Peter Mihalitsianos at one time belonged. One count in the indictment charged Mihalitsianos with attempted arson of a tavern frequented by members of a rival club. The trial judge permitted the government to elicit from a witness named Spring that Spring had overheard one Richter, a Pagans club leader, describing the maladroit manner in which Mihalitsianos and another individual had attempted the unsuccessful arson. Thus the out-of-court statement was offered to inculpate the defendant. The trial judge received Spring's account of what Richter said on the ground that Richter's declarations were admissible under the coconspirator exception to the hearsay rule found in Fed.R.Evid. 801(d)(2)(E). The Second Circuit expressed some doubt about that ruling, but went on to say:

> Even if Richter's statements, overheard by Spring, were not admissible under the coconspirator exception, any error was harmless because the statements could have been admitted as statements against interest. *See* Fed. R.Evid. 804(b)(3). Richter invoked his Fifth Amendment right not to testify at Mihalitsianos' trial and thus was an unavailable witness under Fed.R.Evid. 804(a)(1); an admission to arson was contrary to Richter's penal interest; and the trustworthiness of Richter's statements was corroborated by the testimony of Joseph Whittaker, whose descriptions of the scene of the arson the day of the crime (a) matched Richter's description of Mihalitsianos' actions and (b) substantiated the motive offered by Richter.

260 F.3d at 158–59.

In *Desena* the Second Circuit's analysis of corroboration was limited to the trust-

worthiness of the out-of-court statement, and gave no consideration to the trustworthiness of the witness (Spring) or the declarant (Richter). As the Second Circuit noted in *Doyle,* that is the approach favored by the Weinstein treatise. However, there may have been no evidence available to the defense with which to challenge the trustworthiness of the witness or the declarant, at least with respect to the declaration at issue.

In the case at bar, defendants Camacho and Rodriguez offer Cherry's declarations to exculpate themselves. Accordingly *Doyle* stands as the most recent Second Circuit squarely addressing the requirement of corroboration of exculpatory hearsay declarations under Rule 804(b)(3). While, as noted, the *Doyle* court acknowledged with evident respect Judge Weinstein's view that "it is the statement, not the witness or the declarant, that must be trustworthy" to render a declaration admissible under Rule 804(b)(3), the court of appeals' decision in *Dòyle* rested in part upon the lack of trustworthiness of the declarant, Nothacker. I have previously quoted the Second Circuit's observation in *Doyle* that "the credibility of an absent declarant is a consideration pertinent to the probative value of her or his testimony"; the court also said in that regard: "While Nothacker may not have altered his story as many times as did the absent defendant in *Bahadar,* the former's inconsistent stories suggest a similar risk of fabrication." 130 F.3d at 544.

Therefore I conclude that, under the present law of this circuit, I must consider the trustworthiness of Cherry as a declarant, as well as the trustworthiness of the declarations attributed to him. That is so, whether the consideration of Cherry's trustworthiness is undertaken solely as part of the corroboration requirement of Rule 804(b)(3), as indicated by *Salvador*

and *Bahadar,* or as the result of an interaction between Rule 804(b)(3) and Rule 403, as the Second Circuit suggested in *Doyle.*

Courts construe the requirement for "clear" corroboration in light of its purpose of assuring that defendants have not fabricated evidence. *Rodriguez,* 706 F.2d at 40. Thus, the fact that a hearsay statement is supported by the defendant's testimony is not sufficient corroboration. *Id.* Nor is it sufficient that a hearsay statement is "merely consistent" with a fact in evidence. *Silverstein,* 732 F.2d at 1347 ("Although the fact that Matthews was let out of his cell before the discovery of Chappelle's body provides slight corroboration for his [confession that he murdered Chappelle], the medical evidence that Chappelle was killed by two men and the estimate of the time of death entitled the judge to conclude that the circumstances did not clearly indicate that Matthews' confession was trustworthy."). Corroboration of a hearsay statement must give rise to a "strong, not merely allowable," inference of trustworthiness. *Salvador,* 820 F.2d at 561. On the other hand, defendants need not prove that the hearsay statement is certainly true, only that there are clear indicia of reliability. *Doyle,* 130 F.3d at 543 (noting that "it is the role of the jury-not the court-to assess the credibility of witness testimony").

The Second Circuit has considered in comparable situations the reliability of statements made by a defendant's alleged partner in crime. *United States v. Doyle,* 130 F.3d 523, discussed *supra,* is such a case. In *United States v. Matthews,* 20 F.3d 538, 544–46 (2d Cir.1994), the Second Circuit considered the reliability of a statement by a codefendant to determine whether admission of the statement violated the Confrontation Clause. The analysis of a statement's reliability under the Con-

frontation Clause is analogous to an analysis of reliability under Rule 804(b)(3). *See United States v. Katsougrakis,* 715 F.2d 769, 776 (2d Cir.1983) ("As a practical matter … a hearsay statement that satisfies the penal interest exception usually will survive Confrontation Clause scrutiny because the "trustworthiness" issue has already been decided in favor of admissibility."). In *Matthews,* defendants Matthews and Prater were charged with bank robbery. Prater's girlfriend testified at trial that Prater had described to her how he had committed the robbery with Matthews and another person. This conversation allegedly took place three days after the robbery. The court held that Prater's statements to his girlfriend were sufficiently trustworthy that they could be admitted as hearsay evidence against Matthews. The court based its conclusion on the fact that Prater made the statements spontaneously to a close friend in a private setting, without minimizing his responsibility in any way and without any expectation that his statements would be disclosed to the authorities.

Decisions in other circuits have dealt with situations comparable to the present case and provide helpful analysis. The Fifth Circuit in *United States v. Bagley,* 537 F.2d 162 (5th Cir.1976), upheld a district court's decision to exclude evidence of a statement by a prison inmate that exculpated the defendant. Bagley was charged with possessing heroin with intent to distribute while he was incarcerated in a federal prison. Bagley testified at trial that another inmate, Schropshire, had asked Bagley to deliver a package of Valium capsules to another inmate. Schropshire had died approximately a month after the alleged offense. Three other inmates were permitted to testify at trial that they had heard Schropshire tell Bagley that the package contained Valium. The judge did not, however, allow testimony by Schrop-

shire's cellmate, Bobby Duke, regarding a conversation he had with Schropshire on the day when Bagley was discovered with heroin. According to Duke, Schropshire said that he asked Bagley to deliver a bag of Valium and then later realized that he had given Bagley a bag of heroin instead. The court of appeals first found that the circumstances of Schropshire's statement to Duke clearly corroborated its reliability. Schropshire was in the best position to know whether he had given Bagley heroin by mistake, and since the statement was purportedly made before Schropshire could have known that prison guards had discovered the heroin, Schropshire had no motive to lie about the matter. The court then evaluated as a "second element of reliability" whether the statement by Schropshire was actually made-an approach different from that of the Second Circuit, which for purposes of admissibility regards the credibility of the in-court witness as irrelevant. *Casamento,* 887 F.2d at 1170. The Fifth Circuit upheld the district court's determination that Duke had fabricated the statement to help Bagley.

In *United States v. Silverstein,* 732 F.2d 1338, 1346–47 (7th Cir.1984), the Seventh Circuit upheld the district court's exclusion of a confession under Rule 804(b)(3). Silverstein, a member of the Aryan Brotherhood incarcerated in federal prison, was charged with murdering a black inmate. Another white inmate, Matthews, was called to testify for the defense. Matthews confessed to the murder but then, after the court's intervention, invoked the Fifth Amendment, and the court instructed the jury to disregard Matthews' statement. The defense then sought, unsuccessfully, to introduce evidence that Matthews had previously confessed to the FBI. The court of appeals found that there were strong indications

that Matthews' statements were totally fabricated. The court believed that Matthews was likely a sympathizer of the Aryan Brotherhood and had nothing to lose by risking a conviction for murder since he was already serving three life sentences. Furthermore, there was no clear corroboration for the truth of Matthew's confession. Matthews was released from his cell into the cellblock corridor shortly before the victim's body was discovered, but medical evidence showed that the victim was murdered earlier, and by two persons.

In *United States v. Satterfield,* 572 F.2d 687, 690–93 (9th Cir.1978), the Ninth Circuit upheld the district court's exclusion of a statement by a codefendant that exculpated the defendant. Satterfield and his codefendant, Merriweather, were charged with robbing two banks. Satterfield sought unsuccessfully to introduce hearsay evidence that Merriweather, during an argument with Satterfield, acknowledged that Satterfield was not involved in either robbery. The court of appeals noted that several circumstances corroborated the trustworthiness of Merriweather's statements: 1) the statements were made spontaneously during an argument; 2) since Merriweather expressed concern about jeopardizing his appeal, he believed that his statements were against his penal interest, and 3) Merriweather accused Satterfield of breaking up his marriage, and his bad feelings toward Satterfield would presumable make him disinclined to exculpate Satterfield falsely. The court also noted several circumstances that indicated that Merriweather's statements were not trustworthy: 1) Merriweather's appeal was unlikely to succeed and therefore his statements were virtually risk-free, 2) the argument took place two years after the robberies, 3) no evidence substantiated the comments about Merriweather's failed marriage, 4) Merriweather's statement was not corroborated by other evidence-eight witnesses identified Satterfield as one of the robbers, and Satterfield's alibis for the two robberies were, respectively, "strongly impeached" and "virtually demolished." *Id.* at 693. The Ninth Circuit concluded that the district judge had not abused his discretion in concluding that Merriweather and Satterfield had staged the argument.

While the facts of the cases discussed above do not perfectly match those in the present case, they are similar in several respects, and their analysis provides useful guidance. *See also United States v. Bahadar,* 954 F.2d 821 (2d Cir.1992) (first denying request for judicial immunity, then finding that hearsay statement was not reliable because declarant repeatedly changed his story); *United States v. Gossett,* 877 F.2d 901, 906–07 (11th Cir.1989) (upholding determination in mutiny case that confession by codefendant to cellmate was unreliable because it was contradicted by other evidence, notably testimony by defendant); *United States v. Katsougrakis,* 715 F.2d 769, 773–78 (2d Cir.1983) (upholding admission of self-inculpatory statements by coconspirator to friend and to wife); *United States v. Thomas,* 571 F.2d 285, 288–90 (5th Cir.1978) (requiring admission of codefendant's statement that defendant was not involved in crime, because statement was made spontaneously and in presence of Magistrate, was inconsistent with codefendant's plea, and was consistent with evidence showing that defendant's participation in crime was minimal); *DeBinder v. United States,* 303 F.2d 203 (D.C.Cir.1962) (ordering hearing to test reliability of signed confession by twin brother of defendant).[11]

---

**11.** For some inexplicable reason, the parties

devote considerable attention in their briefs to

## 2. Clear Corroboration of the Statement by Cherry to Thomas

First I will consider whether the circumstances of Cherry's statement to Thomas clearly corroborate its reliability, and then I will consider whether any evidence at trial clearly corroborates the truth of Cherry's statement. I assume for purposes of this analysis, limited to the question of admissibility, that what Thomas describes in his affidavit actually took place and that Thomas did not concoct the events described in collaboration with Cherry or the defendants. *See United States v. Casamento*, 887 F.2d 1141, 1170 (2d Cir.1989). However, I set aside the question of Thomas's credibility only for the present, because I may need to evaluate the likely impact of his testimony on a jury in order to determine whether a new trial is warranted. *See* Part III.D., *infra*.

Courts have recognized multiple factors that are relevant to determining the reliability of an out-of-court confession. *See, e.g., Chambers v. Mississippi*, 410 U.S.

284, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1973); [12] *Satterfield*, 572 F.2d at 693 (listing circumstances that supported reliability and circumstances that detracted from reliability in that case). I find the following factors to be relevant to the reliability of Cherry's statement to Thomas:

First, the fact that a statement directly inculpates the declarant, and no one else, argues in favor of its reliability. *See Lilly v. Virginia*, 527 U.S. 116, 131, 119 S.Ct. 1887, 144 L.Ed.2d 117 (1999) (recognizing that confessions that additionally inculpate an accomplice are "inherently unreliable"); *United States v. Matthews*, 20 F.3d 538, 545 (2d Cir.1994) ("So much of a statement as simply implicates the declarant in a crime is generally trustworthy.... However, to the extent that the declarant's statement implicates another person in the crime, it may in some circumstances constitute an attempt to minimize the declarant's own culpability, or to shift blame to another, or to curry favor with authorities."). Cherry identified only himself as

the two-page opinion in *DeBinder*, a case decided by the District of Columbia Circuit in 1962. Since that time, the Second Circuit and other circuits have issued many thorough opinions dealing with the same issue, several of which are cited in the text.

**12.** The Court in *Chambers* found that the state court's refusal to admit hearsay evidence that another person had confessed to the crime violated the defendant's due process rights, because the confessions were extremely reliable and vital to the defense:

> The hearsay statements involved in this case were originally made and subsequently offered at trial under circumstances that provided considerable assurance of their reliability. First, each of McDonald's confessions was made spontaneously to a close acquaintance shortly after the murder had occurred. Second, each one was corroborated by some other evidence in the case.... The sheer number of independent confessions provided additional corrobora-

tion for each. Third, whatever may be the parameters of the penal-interest rationale, each confession here was in a very real sense self-incriminatory and unquestionably against interest.... Finally, if there was any question about the truthfulness of the extrajudicial statements, McDonald was present in the courtroom and was under oath. He could have been cross-examined by the State, and his demeanor and responses weighed by the jury.

*Chambers*, 410 U.S. at 300–01, 93 S.Ct. 1038 (footnotes omitted). The Second Circuit has sometimes considered the factors set forth in *Chambers* in applying Rule 804(b)(3). *United States v. DeVillio*, 983 F.2d 1185, 1190 (2d Cir.1993) (considering "three-part test for evaluating trustworthiness as set forth in *Chambers*"); *United States v. Guillette*, 547 F.2d 743, 754 (2d Cir.1976) (summarizing "four general considerations" articulated in *Chambers*); *see also United States v. Beltempo*, 675 F.2d 472, 480 (2d Cir.1982) (identifying factors named in *Chambers* as *required* for admissibility under Rule 804(b)(3)).

the perpetrator of the murders, exculpating Camacho and "another person," and not naming anyone as an accomplice.

The timing of Cherry's statement to Thomas undermines its reliability to some degree. The conversation took place in June of 1998, two years after the murders. *See Chambers*, 410 U.S. at 300, 93 S.Ct. 1038 ("[E]ach of McDonald's confessions was made ... shortly after the murder had occurred."); *Latine*, 25 F.3d at 1167 ("[T]he statement was made shortly after the criminal incident, thereby giving Saldana little opportunity to reflect on the events and to prepare a story."); *Satterfield*, 572 F.2d at 693 ("The substantial length of time between the robberies, which occurred in the late summer of 1974, and the declarations, which occurred in the fall of 1976, reduces their trustworthiness."); *United States v. Guillette*, 547 F.2d 743, 754 (2d Cir.1976) ("Souca made his incriminating statement some four months after LaPolla's death.").

The context of Cherry's statement, on the other hand, supports its reliability. The statement was made spontaneously to a friend, in response to a casual remark. While Thomas and Cherry were sitting together, Thomas noticed that Camacho did not greet him, and Cherry explained that Camacho was in prison for a crime that Cherry committed. Courts have found such statements to be more reliable than statements made in response to coercive questioning by police officers or prosecutors. *See Lilly*, 527 U.S. at 139, 119 S.Ct. 1887 ("Mark was in custody for his involvement in, and knowledge of, serious crimes and made his statements under the supervision of governmental authorities. He was primarily responding to the officers' leading questions.... Thus, Mark had a natural motive to attempt to exculpate himself as much as possible."); *Chambers*, 410 U.S. at 300, 93 S.Ct. 1038 ("[E]ach of McDonald's confessions was made spontaneously to a close acquaintance...."); *Latine v. Mann*, 25 F.3d 1162, 1167 (2d Cir.1994) ("Saldana made the statement to a perceived ally, not to law enforcement officials...."); *DeVillio*, 983 F.2d at 1190 ("Heidel did not make the statement "spontaneously" because at the time the tape was made, he was cooperating with the Government and wearing a wire during a continuing investigation."); *United States v. Katsougrakis*, 715 F.2d 769, 775 (2d Cir.1983) ("The declarant was ... talking privately with his friend when the challenged admission was made. He was not conversing with police or other government agents whose favor he might be expected to curry."); *see also Matthews*, 20 F.3d at 545–46; *Salvador*, 820 F.2d at 562; *Satterfield*, 572 F.2d at 693; *Bagley*, 537 F.2d at 165–67; *Thomas*, 571 F.2d at 289.[13]

The reliability of Cherry's statement to Thomas would be diminished if Cherry had a motive to lie. Since Cherry was a member of the C & C gang and a codefendant of Camacho and Rodriguez, there is reason

---

**13.** The government relies heavily on the frequent application of Rule 804(b)(3) to plea allocutions and argues that "[a]bsent a sworn statement," there is no basis for admission under Rule 804(b)(3). Mem. of Law at 9. It is true that the Second Circuit has found that formal sworn statements tend to be reliable. *United States v. Moskowitz*, 215 F.3d 265, 269 (2d Cir.2000) (plea allocution reliable); *United States v. Winley*, 638 F.2d 560, 562 (2d Cir.1981) (guilty plea reliable); *see also Scar-* *pati v. United States*, No. 93 Civ. 740, 1994 WL 256691, at *4 (S.D.N.Y. June 7, 1994) (unsworn statement not reliable). The Second Circuit has not, however, limited the application of Rule 804(b)(3) to formal sworn statements. Rather, as the cases cited in the text demonstrate, this Circuit has recognized that informal, spontaneous statements also tend to be sufficiently reliable to justify admission.

to believe that he would want to help them. *See Salvador,* 820 F.2d at 562 ("Guzman was not clearly trustworthy since he knew Oscar and may have had reason to lie for him ...."); *see also United States v. Duke,* 255 F.3d 656, 658–60 (8th Cir.2001) (confession by brother of defendant); *Silverstein,* 732 F.2d at 1346 (confession by white inmate, presumed to sympathize with Aryan Brotherhood and therefore to be allied with defendant, who was member of Aryan Brotherhood). However, assuming that Thomas is telling the truth, there is no reason to believe that Cherry expected his spontaneous remark to a friend to be conveyed to this Court and used as evidence exculpatory of Camacho and Rodriguez. *See Katsougrakis,* 715 F.2d at 778 ("Chrisanthou had no motive to lie to his wife...."); *Bagley,* 537 F.2d at 167 ("[T]he record is completely devoid of evidence of any motive for Schropshire to misrepresent this matter to Duke. At the time that the statement was purportedly made, neither Duke nor Schropshire could have known that Bagley had been searched and that the heroin had been discovered. Schropshire therefore could not have intended to help Bagley...."). In comparable circumstances, the Second Circuit has recently noted:

> In the present case, we are persuaded that the trustworthiness condition was met, given the circumstances and content of Prater's statements. The statements were not made to law enforcement authorities, were not made in response to questioning, and were not made in a coercive atmosphere. Rather, they were volunteered by Prater to his girl-friend, an intimate and confidante, in the private recesses of their home. There were no coercive pressures, and there was no attempt to curry favor with authorities. Indeed, when he made the statement to Dunbar, Prater had no reason to ex-

pect that his admission would ever be disclosed to the authorities.

*Matthews,* 20 F.3d at 546. Furthermore, Cherry's statement to Thomas explaining Camacho's failure to acknowledge their presence in the library would seem to imply that Camacho was not on speaking terms with Cherry. *See Satterfield,* 572 F.2d at 693 ("The alleged bad feelings between Merriweather and Satterfield ... would make Merriweather less likely to make untrue statements exculpatory of Satterfield.")

The extent to which a declarant expects his statement to subject him to criminal liability also reflects on the statement's reliability. *Chambers,* 410 U.S. at 301, 93 S.Ct. 1038 ("McDonald stood to benefit nothing by disclosing his role in the shootings to any of his three friends and he must have been aware of the possibility that disclosure would lead to criminal prosecution."); *United States v. Moskowitz,* 215 F.3d 265, 269 (2d Cir.2000) (holding plea allocution to be reliable because it subjected declarant to lengthy prison term); *Satterfield,* 572 F.2d at 691 (finding that statement by convicted codefendant was only minimally against his penal interest because his appeal was unlikely to succeed); *Lemus v. Artuz,* 131 F.Supp.2d 532, 535–36 (S.D.N.Y.2001) (upholding finding by state trial court that declarant falsely claimed responsibility for murder because he believed he had immunity from prosecution and wanted to placate prosecutor). Cherry had already been convicted pursuant to a plea bargain, so the extent to which the statement is against his penal interest is diminished. *See Duke,* 255 F.3d 656, 659–60 ("Confessions given only after the confessor's conviction, and especially when proffered by relatives or friends, are engulfed in an aura of suspicion and doubt.") (quotations and citations omitted). Cherry had not yet been sentenced, so the

government could theoretically have introduced evidence of his confession at the sentencing hearing. But since Thomas was helping Cherry prepare for his sentencing, Cherry certainly would not have expected Thomas to divulge his confession to the government. *Matthews,* 20 F.3d at 546 ("Prater had no reason to expect that his admission would ever be disclosed to the authorities.").[14] It is also unlikely that Cherry would have expected that his statements to Thomas would result in investigation or prosecution. For one thing, Cherry had already accepted a plea bargain pursuant to which the government dropped multiple serious charges including two counts of murder. Furthermore, Cherry made statements to counsel for Rodriguez in 1997 and 1998 implying that he was responsible for the crimes for which Camacho and Rodriguez were convicted and he must have expected those statements to be repeated in court or otherwise conveyed to the government.

The consistency of statements by Cherry is another factor to be taken into account. *See United States v. Bahadar,* 954 F.2d 821, 829 (2d Cir.1992) ("[T]he circumstances-repeated changes in Ali's story-would properly make any district judge suspicious of the statement's reliability."); *Doyle,* 130 F.3d at 544 ("While Nothacker may not have altered his story as many times as did the absent declarant in *Bahadar,* the former's inconsistent stories suggest a similar risk of fabrication."). Cherry's statement to Thomas in June of 1998 is consistent with his statements to counsel for Rodriguez in the fall of 1997 and the fall of 1998. His statement to Thomas is inconsistent, however, with his statements to police on March 30, 1993, which he

confirmed with government prosecutors in February of 1996, identifying Williams and Camacho as the shooters. Gov. Mem. of Law, Addolorato Aff., Exhibit at 1–2.

Statements to police and prosecutors by criminal suspects or defendants are not considered to be reliable, because the declarant generally wants to obtain favorable treatment; Cherry's statements to the police were especially unreliable because they were self-exculpatory. *See Williamson v. United States,* 512 U.S. 594, 601, 114 S.Ct. 2431, 129 L.Ed.2d 476 (1994) (" '[T]he arrest statements of a codefendant have traditionally been viewed with special suspicion. Due to his strong motivation to implicate the defendant and to exonerate himself, a codefendant's statements about what the defendant said or did are less credible than ordinary hearsay evidence.' ") (citing *Lee v. Illinois,* 476 U.S. 530, 541, 106 S.Ct. 2056, 90 L.Ed.2d 514 (1986)); *see also Matthews,* 20 F.3d at 545. In Cherry's statement to police, he said that he talked with Camacho and Williams after the murders but did not mention that he was with them immediately before the murders, which the government's evidence showed he was. Evidently, Cherry admitted to the government in February of 1996 that he had lied to police by falsely accusing another person of a murder he had committed and by minimizing his involvement in yet another murder he had committed; otherwise, he affirmed the truth of his statements to police. Gov. Mem. of Law, Addolorato Aff. ¶ 6. This information leads to the conclusion that Cherry's statements to the police are extremely unreliable, not to the conclusion, which the government urges, that Cherry's unrecanted

---

**14.** As previously noted, Cherry's expectation that Thomas would not disclose his confession to the authorities also enhances the reliability of his statement, because it indicates that he

was not motivated by a desire to help Camacho and Rodriguez challenge their convictions in court. *See* supra page 307.

statements are trustworthy.[15] It also leads to the conclusion that Cherry is not always truthful, at least when speaking with government authorities, and possibly more generally.

A final factor to consider is that Cherry is a recently convicted felon. Courts typically distrust statements made by convicted criminals. *See United States v. Gossett*, 877 F.2d 901, 907 (11th Cir.1989) ("The trial judge was also entitled to consider the fact that Brown was a prison inmate in determining whether his testimony would be trustworthy."); *Bagley*, 537 F.2d at 167–68 ("[E]ach of the critical defense witnesses [at the hearing] was a prison inmate who had been convicted of a crime."); *United States v. Mejia–Velez*, 855 F.Supp. 607, 617 (E.D.N.Y.1994) ("[S]tatements by individuals about their criminal accomplishments are often made untruthfully, for an intended effect on others.").

In summary, Cherry's inconsistent statements regarding the shootings on January 2, 1993, taken together with the fact that Cherry has recently been convicted of a felony, seriously weaken his credibility. Furthermore, the significant amount of time that had elapsed between the shootings and the conversation between Cherry and Thomas, and the fact that Cherry had already been convicted, reduces the reliability of Cherry's statements. However, the circumstances of Cherry's statements to Thomas-the friendly, private nature of their conversation and the spontaneous, casual way the statements were made-argue in favor of their reliability. Even if Cherry were willing to lie to help Camacho and Rodriguez, there is no reason to believe that Cherry expected his statements to Thomas to be used in court. It is entirely plausible that Cherry truthfully identified the shooters to police

but, after securing his plea bargain, has been trying to help his friends Camacho and Rodriguez overturn their convictions. It is equally plausible that Cherry falsely accused Camacho when confronted by police but later honestly admitted his involvement to an inmate friend and tried to help Camacho and Rodriguez, while still protecting himself, by telling Rodriguez's attorney that he would testify with a grant of immunity. At this point, I withhold judgment as to whether Cherry's credibility and the circumstances of his conversation with Thomas clearly corroborate his statements. For reasons described below in Part III.C., I will conduct an evidentiary hearing to evaluate Thomas's proposed testimony. Such a hearing may provide useful insight into the circumstances of Cherry's statements to Thomas.

I now turn to the question of whether other evidence provides clear corroboration for the truth of Cherry's statement to Thomas that he committed the murders for which Camacho and Rodriguez were convicted. The surviving victim, Luis Garcia, testified that Williams and Cherry were the shooters. In addition, the government's evidence shows that Williams and Cherry were being targeted by Ocasio and that Cherry was deeply involved in planning the murder of Ocasio, to such an extent that a plan to commit the murder in December of 1992 was called off because Cherry failed to appear. Also, the government's evidence suggests that Cherry collaborated with Albizu and Williams on the afternoon of the shootings to hijack a second get-away car and that Williams and Cherry fled the scene of the murder together in that car. Of course, Cherry's confession also contradicts testimony by Welch, the driver of the first car, that he saw Williams and Camacho commit the

---

**15.** The government makes the untenable argument that Cherry's statements accusing *others* of murders were against his own penal interest. Gov. Mem. of Law at 7–8.

shootings. It also contradicts Albizu's testimony that Camacho bragged to him the day after the murder about how he and Williams had performed the shootings. However, Cherry's statement to Thomas need not be uncontradicted to be admissible.[16] *See Doyle*, 130 F.3d at 543 ("The court does not have to conclude that the statements sought to be admitted were surely true, for it is the role of the jury-not the court-to assess the credibility of witness testimony. Yet, because hearsay testimony lacks the traditional assurances of reliability such as the effect of the solemn courtroom on the witness and the more significant opportunity for cross-examination by the opposing party, the court does need to assure itself that there are, at least, clear indicia of reliability."); *Salvador*, 820 F.2d at 562 (explaining that contradictory evidence does not preclude admission of exculpatory statement but does detract from "clarity of corroboration"). The government has not argued that Cherry's statement is not clearly corroborated by other evidence presented at trial. While there does not appear to be any real dispute regarding this element of corroboration, I nevertheless withhold judgment until after the evidentiary hearing so that I may consider all issues relevant to admissibility at once.

### B. *Whether a New Trial is Required*

 A court may grant a motion for a new trial in a criminal case "if the interests of justice so require." Fed.R.Crim.P. 33. The standards governing motions for a new trial are strict, and a district court may grant a new trial only in "the most extraordinary circumstances." *United States v. Gambino*, 59 F.3d 353, 364 (2d Cir.1995); *United States v. Spencer*, 4

F.3d 115, 118–19 (2d Cir.1993). Defendants must show that they could not have discovered the new evidence prior to or during trial and that the new evidence is so material and noncumulative that it would likely have resulted in a different verdict. *United States v. Torres*, 128 F.3d 38, 48–49 (2d Cir.1997); *United States v. Siddiqi*, 959 F.2d 1167, 1173 (2d Cir.1992). District courts have discretion to evaluate the new evidence in light of the evidence produced at trial and to determine the probable impact of the new evidence on a jury. *Gambino*, 59 F.3d at 364.

 A new trial is warranted where a defendant presents newly discovered evidence that is material and noncumulative and that would probably lead a jury to acquit the defendant. *Torres*, 128 F.3d at 48–49; *Siddiqi*, 959 F.2d at 1173. Since the alleged conversation between Cherry and Thomas took place two years after defendants' trial, it is newly discovered; defendants could not have presented evidence of Cherry's statement at trial. Furthermore, as this Court stated in its opinion of December 1, 1999, evidence of a confession by Cherry clearly would be material and noncumulative. *United States v. Camacho*, No. S12 94 Cr. 313, 1999 WL 1084229, at *5 (S.D.N.Y. Dec. 1, 1999) ("Cherry's proposed testimony is anticipated to be exculpatory. Indeed, it is among the most direct forms of exculpatory evidence that exist-a confession. . . . There can be no substitute for a confession to the crime by the culprit (if that confession is truthful)."). The only remaining issue is whether evidence of Cherry's statement, if it had been presented to the jury at trial, would likely have created reasonable doubt

---

16. To require that exculpatory statements be uncontradicted, or even that they be corroborated by a preponderance of the evidence, would effectively limit application of the penal interest exception to cases where the defendant would likely be acquitted even without admission of the exculpatory statement.

in the minds of the jury. *See Spencer,* 4 F.3d at 119 ("[The] court must weigh whether or not there is in reality a significant chance that the disclosure would have induced a reasonable doubt in the minds of enough jurors to prevent a conviction.") (internal quotations and citation omitted).

██ In order to justify a new trial, newly discovered evidence must directly contradict central evidence in the government's case, not merely further discredit government witnesses. *Gambino,* 59 F.3d at 366; *Spencer,* 4 F.3d at 119; *United States v. Aguillar,* 387 F.2d 625, 626 (2d Cir.1967); *see also Siddiqi,* 959 F.2d at 1173–74 (new evidence warranted new trial because it was from impartial source and corroborated defendant's own testimony on decisive issue). Cherry's statement that he and not Camacho committed the shootings would directly contradict testimony by government witnesses on the most central issue in the case.

██ A confession by another person to the crime charged, if found credible, is generally the sort of evidence that may warrant a new trial. *Casias v. United States,* 337 F.2d 354, 356 (10th Cir.1964) ("No one can doubt that a confession by another party to the crime for which the petitioner has been tried and convicted, if discovered after conviction, would be grounds for a new trial. The integrity of the confession is a matter within the province of the trial Court...."); *DeBinder v. United States,* 303 F.2d 203, 204 (D.C.Cir. 1962) ("The credible confession of another to the commission of a crime for which an accused has been convicted is, of course, sufficient ground for a new trial. Here, however, the alleged confession itself, the circumstances surrounding its execution and the relationship of the parties concerned counsel caution lest the court be the victim of an imposition. This 'confession' should be tested in open court.")

(footnotes omitted); *see also United States v. Duke,* 255 F.3d 656, 659–60 (8th Cir. 2001) (finding that confession by brother of defendant, after both were convicted, would not likely be found credible by jury).

In order to determine whether testimony by Thomas regarding Cherry's confession would likely lead to an acquittal, two distinct questions must be answered. First, if the jury heard testimony by Thomas, would the jury have reasonable doubt that Camacho was one of the two shooters? This question concerns the relative credibility of Thomas's testimony and testimony by other witnesses in light of the evidence as a whole. Second, if the jury had reasonable doubt that Camacho was one of the two shooters, would the jury have found Camacho and Rodriguez guilty of the crimes charged? Defendants offer several arguments regarding the first question, the credibility of Thomas's testimony compared to other testimony, but do not make any arguments relating to the second question. The government does not undertake any analysis in its memorandum of law of how evidence of Cherry's statement would affect the outcome of a trial.

In assessing the credibility of Thomas's testimony compared to testimony by other witnesses, a jury would presumably consider 1) the trustworthiness of Thomas as a witness, 2) the trustworthiness of Cherry when he confessed to Thomas, and 3) the trustworthiness of witnesses whose testimony corroborates or contradicts Thomas's testimony. The second factor, the trustworthiness of Cherry's statement to Thomas, has already been discussed at length in connection with the issue of admissibility under Rule 804(b)(3), *supra* at 31–38. The third factor, the general nature of other testimony that corroborated or contradicted Cherry's statement, was also briefly discussed in connection with

the issue of admissibility, *supra* at 38–40. Luis Garcia was a victim of the crime, and his impartiality and sincerity were not seriously challenged; but the government did successfully attack Garcia's ability to identify the shooters. On the other hand, Welch and Albizu gave extensive and largely consistent accounts of their activities with the defendants on the day of the shootings, but the defense gave the jury good reasons to find that they were not trustworthy. In the end, the jury chose to believe Welch and Albizu rather than Garcia. The jury also necessarily concluded that defendants' alibis were fabricated. While the evidence against the defendants was strong and certainly was sufficient to support the jury's verdicts, it was not so overwhelming and unimpeachable that additional testimony by a credible witness corroborating Garcia's version of events could not have caused the jury to reconsider its conclusions.

I have not yet evaluated the credibility of Thomas as a witness. A jury would have good reason to question Thomas's candor. Considering that Thomas was providing legal assistance to Cherry and was acquainted with Camacho while the three of them were incarcerated together at Otisville, it would not be surprising to learn that Thomas collaborated with Cherry and Camacho to help Camacho overturn his conviction. *Compare Bagley,* 537 F.2d at 167 (testimony by inmate regarding statement by recently deceased cellmate, offered to exculpate another inmate); with *Thomas,* 571 F.2d at 289 (testimony by Magistrate regarding exculpatory statement made within hearing of numerous persons in courtroom). Without a hearing, however, it would be impossible to evaluate the credibility of Thomas as a witness in any meaningful way. Once I have had the benefit of observing Thomas testify regarding Cherry's statement, then I will determine whether his testimony, considered together with other consistent and contradictory testimony, would likely cause a jury to believe that Williams and Cherry committed the shootings, or at least to have reasonable doubt that Williams and Camacho committed the shootings.

Even if a jury were to credit Thomas's testimony and refuse to believe that Camacho committed the shootings with Williams, it is not at all clear that the jury would have acquitted Camacho and Rodriguez of the crimes charged. The government's evidence at trial showed that Camacho and Rodriguez spent the entire afternoon of January 2, 1993, with Albizu and Williams in Welch's car. Defendants presented alibi witnesses to show that they were not with Albizu and Williams that day. Camacho's alibi was directly contradicted by the testimony of a parole officer and by records of his appearance in court. The government also attacked the credibility of Rodriguez's alibi witness. Evidence showing that Williams and Cherry committed the shootings would neither support defendants' alibis nor prove that Camacho and Rodriguez were not involved in the preparations on the afternoon of January 2. Rodriguez was convicted of the murder charges even though there was no allegation that he actually committed the shootings, and the jury may very well have convicted both defendants even if neither of them actually committed the shootings. On the other hand, if the jury were to believe that Cherry's statement was truthful, then the jury would also believe that Albizu and Welch were not telling the truth about the shootings and may not have been telling the truth about the extent of Camacho and Rodriguez's participation in preparations for the shootings. Cherry's confession could undermine the credibility of Albizu and Welch enough that a jury could have reasonable

doubt about the extent to which Camacho and Rodriguez aided the murder, even if the jury still believed that Camacho and Rodriguez were with Albizu and Williams on the day of the shootings. Neither defendants nor the government has made any arguments concerning whether a jury would likely have convicted defendants even if neither of them actually committed the shootings.

### C. *The Necessity for an Evidentiary Hearing*

■ Whether a district court should hold an evidentiary hearing before deciding a motion for a new trial rests in the discretion of that court. *See United States v. Petrillo,* 237 F.3d 119, 124 (2d Cir.2000) ("[W]e review for abuse of discretion the district court's decision to deny Petrillo's motion for a new trial without a hearing"), *citing United States v. Sasso,* 59 F.3d 341, 350 (2d Cir.1995) ("We will not reverse the denial of a new-trial motion or the refusal to conduct an evidentiary hearing absent an abuse of discretion."); *see also United States v. Slutsky,* 514 F.2d 1222, 1226 (2d Cir.1975) ("Nor was it necessary to hold a hearing before ruling on the motion. The moving papers themselves disclosed the inadequacies of the defendants' case, and the opportunity to present live witnesses would clearly have been unavailing.").

■ The particular grounds urged by a defendant on a motion for a new trial may affect the necessity of a hearing. *See, e.g., United States v. DiPaolo,* 835 F.2d 46, 51 (2d Cir.1987) ("When a motion for a new trial is predicated entirely on an affidavit from a trial witness who recants her testimony, a trial judge can ordinarily deny it without a hearing."). However, trial judges have been known to conduct hearings even in such circumstances; *see United States v. Atkins,* 545 F.2d 1153 (8th Cir.1976), where the government's princi-

pal trial witness, one Dilworth, recanted his testimony in a post-conviction affidavit. The court of appeals, affirming the district court's denial of a new trial, noted that "[a]t the evidentiary hearing on appellant's motion for a new trial, Dilworth testified in a manner substantially identical to his sworn statements in the affidavit," but the government introduced contrary evidence, and the district court, "after hearing Dilworth's recanted testimony and observing his demeanor, found that Dilworth had told the truth at trial and that his recanted testimony was not credible." *Id.* at 1154.

■ In the case at bar, neither Thomas nor Cherry appeared at the trial as a witness. I was the trial judge, but I have never seen or heard Thomas or Cherry testify. Accordingly the Second Circuit's inclination against evidentiary hearings in recantation cases does not apply. I find myself in accord with the district judge in *United States v. Falu–Gonzalez,* 996 F.Supp. 150, 152 (D.P.R.1998), who, presented with a motion for a new trial based upon certain telephone records, remarked that "[i]n order to fully address the issues posed by the defendants, the Court held an evidentiary hearing on June 24, 1997, which was continued on November 5, 1997."

I also find guidance in Judge Chin's decision in *Morales v. Portuondo,* 154 F.Supp.2d 706 (S.D.N.Y.2001). In *Morales,* Judge Chin dealt with a state prisoner's habeas petition where individuals who had not testified at the petitioner's murder trial recounted statements by another nonwitness that he had committed the murder, thereby exculpating petitioner. The principles of New York law governing the petitioner's entitlement to a new trial (hearsay, corroboration, and the probable effect upon a new trial) are comparable to those applicable to the case at bar. Before deciding to grant the writ, Judge Chin con-

ducted an evidentiary hearing at which petitioner called five witnesses and the district attorney's office called one, and then heard oral argument of counsel. 154 F.Supp.2d 706, 718–19.

I have concluded that an evidentiary hearing is necessary in this case. At that hearing, Thomas will testify and be cross-examined, and I will be in a position to evaluate his words and his demeanor. Any party may offer additional relevant evidence. After the record is closed, counsel will be given an opportunity to review the evidence, and then I will hear oral argument.

### D. *The Credibility of Thomas*

It is necessary to consider whether, at the evidentiary hearing, it is appropriate for the Court to evaluate the credibility of Thomas as a witness, and if so, for what purpose. If one focuses solely upon the admissibility of Cherry's declarations under Rule 804(b)(3) at a trial, the rule in the Second Circuit would preclude me from making any judgment about the credibility of Thomas's testimony describing those declarations. *United States v. Casamento*, 887 F.2d 1141, 1170–71 (2d Cir.1989), is dispositive on the point. A defendant, Frank Castronovo, was convicted with other defendants by a jury of narcotics charges. The trial judge allowed the government to elicit under Rule 804(b)(3) testimony from one Salvatore Contorno that one Carlo Castronovo "was dealing in drugs with a cousin in the United States," defendant Frank Castronovo. 887 F.2d at 1169. On appeal the Second Circuit affirmed that ruling. The court of appeals held that Carlo Castronovo was "unavailable as a witness" within the meaning of Rule 803(b), and that Carlo's declaration was against Carlo's penal interest, thereby satisfying the first sentence of Rule 804(b)(3). Accordingly the admissibility of Carlo's out-of-court declaration turned upon the presence or absence of corroborating circumstances. The Second Circuit's discussion on that point is worth quoting at length:

> Although Rule 804(b)(3) requires the presence of corroborating circumstances only in the case of statements "tending to expose the defendant to criminal liability and offered to exculpate the accused," this Circuit requires corroborating circumstances even when the statement is offered, as here, to *inculpate* the accused. In determining whether such a statement is trustworthy enough to be admissible, the district court must look to the circumstances in which the declarant made the statement. *However, the court should not look to the credibility of the in-court witness. Assessing the circumstances of an in-court witness is the role of the jury.* Therefore, we reject as not pertinent to the evidentiary ruling Castronovo's argument that Contorno was inclined to lie. Castronovo asserts that Contorno was a "virtual stranger" to Carlo. The district court concluded otherwise, finding for the purposes of its evidentiary ruling that Carlo and Contorno had worked together as cigarette smugglers and cattle dealers. We conclude that the court did not err in making this determination. Therefore, since Carlo was a former business associate, and we perceive no reason from the evidence in the record for him to have lied or attempted to curry favor, we conclude that the that the circumstances in which the statement was made indicate that it was sufficiently trustworthy to be admitted.

887 F.2d at 1170 (citations omitted) (second emphasis added).

The Second Circuit's view that, in determining admissibility for Rule 804(b)(3) purposes the district court "should not look to the credibility of the in-court witness," is not universally held. The Ninth Circuit left the question open in *United States v. Satterfield*, 572 F.2d 687 (9th Cir.1978). Defendant Satterfield offered an exculpatory statement assertedly made by a co-defendant, Merriweather, and overheard by two others, Rosales and Barron. Because the trial court "made it clear that it excluded testimony only because clear circumstances corroborating Merriweather's veracity were absent," the court of appeals found it unnecessary "to decide whether Rule 804(b)(3) ever empowers a judge to exclude hearsay evidence because of the untrustworthiness of the witness"; given the trial judge's rationale, the court of appeals "therefore assumes that Merriweather made the statements which Satterfield, Rosales, and Barron testified he made and that he made them in the circumstances about which they testified." 572 F.2d at 692–93.

In *United States v. Bagley*, 537 F.2d 162 (5th Cir.1976), the Fifth Circuit announced a rule contrary to that articulated by the Second Circuit in *Casamento*. At trial the district court excluded an unavailable witness's exculpatory out-of-court statement proffered by the defendant, even though, in the Fifth Circuit's words, "the proffered statement here clearly affords a basis for belief in its truthfulness *if it was, in fact, made.*" 537 F.2d at 167 (emphasis added). The prosecutor had attacked the credibility of the witnesses defendant called to prove that the exculpatory statement had in fact been made. Affirming the district court's exclusion of the statement, the court of appeals said:

> The requirement that the corroborating circumstances "clearly indicate" the trustworthiness of the statement should be construed to permit the trial judge,

who has the opportunity to judge the credibility of the witness, to exercise discretion in determining whether he is satisfied that the statement is trustworthy. If there was evidence before him from which he could conclude *that the statement was not actually made* (or would not be reliable evidence of the truth of the matter asserted) his exclusion of the statement should be affirmed.

*Id.* at 168 (emphasis added).

The case at bar is complicated by the fact that the admissibility of Cherry's declarations must be viewed in the context of defendants' motion for a new trial under Rule 33. *Casamento* and the other Rule 804(b)(3) decisions previously discussed all arose out of trial judges' evidentiary rulings during trials from which convicted defendants took appeals. In other words, the only question before the courts of appeal was whether, during the trial, the trial judge correctly applied Rule 804(b)(3) in admitting inculpatory out-of-court declarations or excluding exculpatory ones. In this Rule 33 context, the "newly discovered evidence must be of a sort that could, if believed, change the verdict"; and, in making that determination, "the trial court has broad discretion to decide Rule 33 motions based upon its evaluation of the proof produced," *Gambino*, 59 F.3d at 364.

While I am aware of no case discussing the interaction between evidentiary Rule 804(b)(3) and procedural Rule 33, I think that the expanded focus of the present inquiry makes it at least arguable that I may consider the credibility of Thomas as a witness: not to determine the admissibility of Cherry's declarations, but rather to evaluate the likely effect of Thomas's testimony upon the jury at a new trial.

I do not decide the point now, and will hear argument from counsel concerning it. But I entertain no doubt that the prudent course is to develop a full record during the evidentiary hearing. That means that

**316**

the government may cross-examine Thomas fully as to whether or not in fact Cherry made the statements Thomas ascribes to him. The government may also offer extrinsic evidence (if it has any) bearing upon that question of fact.

### E. *Due Process*

Camacho makes a due process argument in his reply brief based on *Chambers v. Mississippi,* 410 U.S. 284, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1973).[17] Reply Mem. at 3–4. Camacho seems to contend both that due process requires that Thomas's testimony be admissible and that due process requires that defendants be granted a new trial. Not surprisingly, Camacho cites no authority for the propositions that there is a due process right to the admission of newly discovered evidence, whether or not corroborated; or a due process right to a new trial based upon such evidence alone. To the extent that Camacho presses those contentions, I reject them.

### CONCLUSION

For the foregoing reasons, I conclude that this Court has jurisdiction to consider defendants' motion under Rule 33 of the Federal Rules of Criminal Procedure. I

deny defendants' request for a grant of judicial immunity for Gregory Cherry to testify. An evidentiary hearing will be held to receive Thomas's testimony and any other evidence relevant to the issues discussed in this Opinion.

A scheduling Order implementing the Opinion will be entered separately.

It is SO ORDERED.

---

**17.** See supra note 12 (quoting from *Chambers*). In *Chambers,* the court was reviewing a habeas corpus petition that alleged due process violations in a state criminal trial. Another person had repeatedly confessed to the crime for which the defendant was charged. When the defendant called that person to take the stand, the court applied the "voucher rule" and refused to allow the defendant to treat the witness as adverse and cross-examine him. In addition, the state court refused to permit evidence of the out-of-court confessions to be admitted into evidence, because the state did not have an exception to the hearsay rule for statements against penal interest. The Court in *Chambers* emphasized the unusual circumstances of the case and held that the state court's application of the voucher rule and the hearsay rule, in combination, violated the defendant's due process

right to present his defense. 410 U.S. at 298, 93 S.Ct. 1038. The Court found that the highly reliable nature of the out-of-court statements and the presence at trial of the declarant distinguished the case from *Brown v. State,* 99 Miss. 719, 55 So. 961 (1911), where the highest state court declined to admit evidence of an out-of-court confession out of a concern that the confession was fabricated by the brother of the accused. *Id.* at 300–01, 93 S.Ct. 1038; *see also Lilly v. Virginia,* 527 U.S. 116, 130, 119 S.Ct. 1887, 144 L.Ed.2d 117 (1999) (*"Chambers* [held] that the Due Process Clause affords criminal defendants the right to introduce into evidence third parties' declarations against penal interest—their confessions—when the circumstances surrounding the statements 'provid[e] considerable assurance of their reliability.' ").